**Robert S. CALVERT et al., Appellants,**

**v.**

**UNION PRODUCING COMPANY, Appellee.**

**No. 11398.**

Court of Civil Appeals of Texas.

Austin.

April 13, 1966.

Rehearing Denied May 4, 1966.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., H. Grady Chandler, Gordon C. Cass, Kerns B. Taylor, Asst. Attys. Gen., Austin, for appellants.

Vinson, Elkins, Weems & Searls, John C. Snodgrass, Houston, for appellee.

PHILLIPS, Justice.

This appeal involves judgments in two causes tried upon a consolidated record. The two cases presented common issues of fact and of law. They involved the right of the State Comptroller to assess additional gas production taxes, penalties and interest pursuant to an audit made by them. The Texas gas production tax, Art. 3.01, Vernon's Annotated Statutes, is fixed as a percentage (presently 7 per cent) of the "market value" of the gas at the wellhead. The taxing statute defines "market value" as the "producer's gross cash receipts," ab-

sent proof of fraud or collusion. The basis for the deficiency assessment fixed by the auditors was the same in both cases; namely, that the seller of the gas, Union Producing Company, and the purchaser of the gas, United Gas Pipe Line Company, were affiliated companies, both being wholly owned by United Gas Corporation, and that in view of such affiliation the contract prices pursuant to which the sales were made should be set aside and disregarded for tax purposes. In the place of the contract prices, pursuant to which Union Producing Company had paid Texas production taxes, the State Auditor substituted contract prices contained in contracts between other third parties in the same fields from which Union's gas was produced. These other contract prices were the highest prices which the Auditor could discover. Pursuant to the statutory scheme Union paid the deficiency assessments under protest and suits for recovery of the taxes, penalties and interest in the amounts of $1,452,584.73 and $14,798.13, respectively, were filed.

Upon order of the court the cases were consolidated and came on for trial on the 13th day of September, 1965. On the eve of the trial, September 10, 1965, appellant filed an amended answer in Cause No. 130,858 wherein the State admitted that the Auditor's assessment of additional taxes, penalty and interest in the amount of $1,452,584.73 was excessive and should be reduced to the sum of $396,189.93. After the trial had commenced, and on the 13th day of September, 1965, the State filed an amended answer in Cause No. 116,312 and admitted that the Auditor's assessment of additional taxes, penalty and interest in that case in the amount of $14,798.13 was also too high and should have been only $11,-027.15. In both actions the State admitted to error in the Auditor's claim that the "market value" of Union's gas should be established at the highest price set forth in any contract covering sales of gas from the various fields in question and substituted in lieu thereof its calculated "weighted average" selling price. This, according to the State's amended pleadings, was the appropriate measure of the "market value" for the assessment of additional taxes, penalty and interest.

After the conclusion of the evidence and upon motion of the appellee, the trial court instructed the jury to return a verdict for the appellee as prayed and in view of the amended pleadings filed by the State, referred to above, the judgment recited that the State did not appeal from judgments in the two cases in the amount of $1,056,394.80 and $4,770.98 but did appeal as to the remaining amounts of $396,189.93 and $11,-027.15.

We affirm the judgment of the trial court.

The question before this Court is the adequacy of the State's proof offered to show that the abovementioned contracts entered into between affiliated companies were fictional insofar as the consideration or price set therein is reflected, and were entered into for the purpose of enabling the producer to escape the payment of taxes due the State of Texas, which would have been otherwise due in a good faith transaction, free from collusion between the purchaser and producer of gas.

Appellant State is before this Court on five points of error, points one and five being briefed together, are the error of the trial court in holding, in effect, that the State, in taxing gas sales under Articles 3.01 and 3.02,[1] Taxation General, is bound

---

1. "Art. 3.01 Calculation of Tax
  (1) There is hereby levied an occupation tax on the business or occupation of producing gas within this State, computed as follows:
  A tax shall be paid by each producer on the amount of gas produced and saved within this State equivalent to seven per cent (7%) of the market value thereof as and when produced.
  Provided, however, that the amount of the tax on sweet and sour gas shall never be less than $121/1500 of one cent (1¢) per one thousand (1,000) cubic feet.

as a matter of law by "collusive" sales contracts for gas entered into between wholly-owned corporate affiliates of a parent gas company; the error of the trial court in instructing the jury and holding that plaintiff, a wholly-owned corporate affiliate of the parent gas company, proved as a matter of law that its gas sales to its corporate affiliate, which was also wholly-owned by the same or common parent gas company, and all of which corporations were operated as a single unified business enterprise under the domination and control of the parent, were bona fide, arms-length transactions, free of any fact issue involving "collusion," said "collusion" being alleged by defendant State and upon which issue substantial circumstantial evidence was introduced as to the plaintiff's unwritten agreement and course of conduct in fixing

virtually all of its gas prices substantially below the weighted price average and market value and thereby operating the plaintiff affiliate at a loss each year, resulting in an admitted savings of State gas and other taxes each year as well as the writing off of and balancing of such losses against the profits of the buyer corporate affiliate and the parent company on their consolidated joint Federal income tax returns each year.

Inasmuch as appellants' points two and three, briefed together, can be answered together with our consideration of points one and five we state them here.

Appellants' point of error number two is that of the trial court in instructing a verdict and holding that under the evidence developed there was no fact question for

(2) In calculating the tax herein levied, there shall be excluded: (a) gas injected into the earth in this State, unless sold for such purpose; (b) gas produced from oil wells with oil and lawfully vented or flared; and (c) gas used for lifting oil, unless sold for such purposes. Acts 1959, 56th Leg. 3rd C.S. p. 187, ch. 1.

Art. 3.02 Market Value

(1) The market value of gas produced in this State shall be the value thereof at the mouth of the well; however, in case gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts. Payments made by purchasers to producers for the purpose of reimbursing such producers for taxes due hereunder shall not be considered a part of the producer's gross cash receipts. In all cases where the whole or a part of the consideration for the sale of gas is a portion of the products extracted from the producer's gas or a portion of the residue gas, or both, the tax shall be computed on the gross value of all things of value received by the producer, including any bonus or premium; provided that notwithstanding any other provision herein to the contrary, where gas is processed for its liquid hydrocarbon content and the residue gas is returned by cycling methods, as distinguished from repressuring or pressure maintenance methods, to some gas producing formation, the taxable value of such gas shall be three-fifths ($\frac{3}{5}$) of the gross value of all liquids extracted, separated and saved from such gas, such value to be determined upon separation and ex-

traction and prior to absorption, refining or processing of such hydrocarbons and such value prior to refining shall be the value of the highest posted price of crude oil in the field where said gas is produced or in the nearest oil field in the event no oil is produced in said field and the quantity of the products shall be measured by the total yield of the processing plant from such gas.

(2) All condensate recovered from gas shall be taxed at the same rate as oil and shall be valued for the purpose of computing the tax due thereon at the prevailing market price for condensate in the general area where the same is recovered. The term 'condensate' shall include all liquid hydrocarbons that are or can be recovered from gas by means of a separator but shall not include any liquid hydrocarbons which can only be recovered from gas by refrigeration or absorption and separated by a fractionating process.

Where additional liquid hydrocarbons other than condensate are recovered from gas the taxable value of such additional liquid hydrocarbons shall be determined by deducting from the total receipts of the producer for all liquid hydrocarbons recovered from his gas the taxable value assigned to the condensate and the applicable rate set forth in sub-section (1) of Article 3.01 shall be applied to the difference to determine the tax due hereunder on such additional liquid hydrocarbons. Acts 1959, 56th Leg. 3rd C.S. p. 187, ch. 1."

the jury on the issue of "collusive sales" made between wholly-owned corporate facilities of a parent gas company; point of error number three is that of the court in instructing a verdict and holding that under the evidence developed there was no fact question for the jury on the issue of the market value of the gas sold by appellee and upon which the gas tax was due under Articles 3.01 and 3.02.

We overrule these points.

■ The definition of market value of gas has been stated by the Texas Supreme Court in W. R. Davis, Inc. v. State, 142 Tex. 637, 180 S.W.2d 429, as the price actually received by the producer. The Court further stated that such a price must be arrived at in good faith, free from fraud and collusion.

■ Appellee has paid the required tax on the basis of its sales to United Gas Pipe Line Company and any liability for additional taxes must be predicated upon a judgment reciting that such payment was made by virtue of contracts entered into through collusion and fraud and not in good faith, consequently setting a price to be paid that was fictional and arrived at for the purpose of fraud. It was the burden of the State to establish the facts of the lack of good faith, fraud and collusion by competent evidence and this they have failed to do.

The State makes the following statement in its brief as to its position here: "The sale of gas is no different from any other business. The free forces of competition, working in a free economy, will provide the atmosphere of good faith, arms length, bona fide contract, and will produce a price commensurate therewith and one which the State has no difficulty in accepting, but when other conditions exist, not in keeping with the above, the State should be free to use other means in determining the price upon which its very life depends—and herein lies the real issue in this law suit."

The "other conditions" referred to are evidently the facts that the companies involved here are affiliated, consequently the State felt free to use "other means" in determining the price which consisted of: first, in ascertaining the highest price paid for gas in a given field and then ascribing this to the appellee as the market price of its gas and then after abandoning this it, secondly, computed a "weighted" average price for the gas in the fields involved and used this price as the market price ascribed to appellee.

The theories upon which the State based these maneuvers, may or may not have merit; however they have no basis in law.

Returning to the question of good faith, fraud and collusion, the State refers to evidence of "the agreement or understanding existing in this case;" that evidence was introduced to the effect that in the Agua Dulce Field the portion of the gas produced and owned by royalty owners, normally the ⅛th royalty interest, was priced at approximately that set by the Comptroller's auditors, while the working interest, normally the ⅞th interest, was priced at a much lower figure; evidence was elicited that United Gas Pipe Line Company, the transmission company, had a refusal on all of the gas produced by appellee; evidence was introduced that the contract price of gas produced by appellee and purchased by United Gas Pipe Line Company was the lowest of all major producers for the period of 1948 to 1949; that evidence was elicited that appellee did not pay any income taxes, or if it did, such taxes were minor, during the major portion of the audit period; evidence was elicited that if appellee had received more money for its gas, it would have paid more gas production tax to the State; evidence was introduced that contracts were amended between appellee, the producer, and

United Gas Pipe Line Company, the purchaser, covering large quantities of gas, and not upon terms that prevail in the original contracts; evidence was presented by appellants showing the weighted average price for gas in the same fields covered by the contracts and for the identical periods.

■ The appellee presented detailed evidence as to the manner in which its contracts for the sale of its gas were entered into. This evidence was that before United Gas Pipe Line Company would buy appellee's gas, its policy was to go into the field in question, make contracts with other non-affiliated producers at arms-length, and then offer identical contracts to appellee. Further, evidence of these contracts was introduced. This is the only competent evidence adduced by either of the parties hereto relative to "the agreement or understanding existing in this case." Here, appellee's evidence was unrefuted. Appellants had nothing more to offer than innuendo or insinuation, consequently, there was no evidence to go to the jury on this issue upon which any valid inferences could have been drawn.

As to appellants' evidence that royalty owners in the Agua Dulce Field received more for their royalty from appellee than appellee paid the owners of the working interest for the same gas, appellee introduced evidence to the effect that market value as used in an oil and gas lease has a different meaning from the definition of market value in the taxing statute before us, as defined by W. R. Davis, Inc. v. State, above. For the meaning of market value regarding an oil and gas lease see Foster et al. v. Atlantic Refining Company, 5 Cir., 329 F.2d 485.

As to the evidence on income taxes as related to the price paid for gas, the evidence disclosed that appellee and United Gas Pipe Line Company paid income taxes on a consolidated return and detailed evidence was presented by appellee to demonstrate that a higher tax paid to the State of Texas would have resulted in a net saving to both companies as their tax to the Federal Government would have been less. This evidence was unrefuted in any manner by appellants.

As to evidence that the contract price of gas produced by appellee and sold to United Gas Pipe Line Company was the lowest of all major producers for the period of 1948 to 1959, appellee presented evidence to show that the State's own exhibit listing the average prices received by producers in Texas Railroad Commission's District 2 shows, contrary to appellants' claim that the price received by appellee was not the lowest of all major producers. This exhibit lists 164 producers with appellee ranked 102. The evidence further reflected without contradiction that at any point in time the price for similar gas in the field varied widely depending primarily upon the date of contract and conditions of delivery. Prices of gas moving under the older contracts were generally lower than under the newer contracts and gas which had been gathered and dehydrated commanded a higher price than gas at the wellhead. Evidence disclosed that the market values which the various taxpayers reported for sales from the Agua Dulce Field in 1955 to range from a high of 11.903¢ to a low of 3.984¢. In this instance the appellee's tax was 7.106¢. It is conceded by both parties that the major portion of this case concerns gas sales in the Agua Dulce Field.

As to appellants' evidence that contracts were amended between appellee as producer and United Gas Pipe Line Company, the purchaser, covering large quantities of gas, not upon terms that prevail in the original contracts, appellee presented uncontradicted evidence that the failure to follow the contract terms referred to above was due to the fixing of prices by the Federal Power Commission. The prices in the Agua Dulce Field are fixed by the Federal Power Commission.

Appellants' evidence regarding United Gas Pipe Line's right of refusal of all of

appellee's gas, evidence that if appellee had received more money for its gas the State would have received a greater tax revenue and evidence showing the weighted average price for gas in the same fields covered by the contracts in question and for identical periods are not material here as elements of proof such as to constitute competent evidence in a case of fraud.

With respect to the weighted average, we likewise overrule appellants' fourth point of error which is that of the court in refusing to permit the appellants to qualify one of their witnesses and to permit the witness to testify and give his opinion on the market value of the gas sold in the event the gas sales in question were deemed "collusive." Such evidence was immaterial in the view that we take here.

■ Irrespective of the foregoing opinion, the following is, in the opinion of this Court, sufficient grounds to affirm this case. Appellants' theory, in summary, is that since the contract prices entered into between appellee and its affiliates are unacceptable to the State, that acceptable prices would be the above-mentioned weighted averages. Appellee conclusively demonstrated that the weighted average prices offered by appellants were incorrect in that they were too high. The reason that the averages were too high was that certain volumes of gas in the field which were sold at prices less than the weighted averages were omitted. Obviously, this would make a substantial difference in the State's claim. These averages were never amended so as to correct this error, consequently the State was unable to prove its damages with sufficient certainty to enable a jury to compute them. See Jordan v. Cartwright, Tex.Civ.App., 347 S.W.2d 799, no writ history.

■ Throughout appellants' brief there is the inescapable suggestion that price fixing contracts, such as we have here, entered into between affiliated companies are, by their very nature, fraudulent. In oral argument before this Court the able assistant attorney general representing the appellants stated this proposition and asked this Court to declare prices fixed between such affiliates illegal. We reject this argument. See Standard Oil Co. v. United States, D.C., 63 F.Supp. 48.

■ We hold that for appellants to have rejected appellee's contract prices and establish some other price it was incumbent upon it to show fraud, collusion and bad faith. While fraud may be proved by circumstantial evidence, mere conjecture, is not enough. Evidence that does not necessarily or naturally or reasonably tend to that conclusion is not sufficient. Fraud must be clearly established. See 26 Tex. Jur.2d, Sec. 111, p. 78 and the cases there cited.

■ The evidence that appellants assert is sufficient to have sent this case to the jury is "so weak that it only raised a mere surmise or suspicion of the existence of some or all of the essential facts sought to be established, then it was the duty of the trial court to withdraw the case from the jury or to instruct the verdict. * * * Where circumstances are equally consistent with the existence and nonexistence of an ultimate fact sought to be established, such circumstances are wanting in probative force as any evidence tending to establish the existence of the ultimate fact." South Texas Water Co. v. Bieri, Tex.Civ.App., 247 S.W.2d 268, writ ref., n. r. e.

We affirm the judgment of the trial court.

Affirmed.