**DORCHESTER MASTER LIMITED PARTNERSHIP, Appellant,**

v.

**Bob BULLOCK, Comptroller of Public Accounts of the State of Texas, et al., Appellees.**

**No. 3–89–168–CV.**

Court of Appeals of Texas, Austin.

July 11, 1990.

Rehearing Overruled Aug. 29, 1990.

David C. Duggins, David H. Gilliland, Clark, Thomas, Winters & Newton, Austin, for appellant.

Jim Mattox, Atty. Gen., William E. Storie, Asst. Atty. Gen., Austin, for appellees.

Before SHANNON, C.J., and CARROLL and ABOUSSIE, JJ.

SHANNON, Chief Justice.

Appellant Dorchester Master Limited Partnership seeks to set aside the summary judgment of the district court of Travis County. On cross motions the district court rendered summary judgment that appellant take nothing in its suit to recover gas production taxes paid under protest. This Court will reverse the summary judgment.

A gas production tax is imposed upon the producer of gas at the rate of 7.5 percent of the market value of gas produced and saved in Texas by the producer. Tex.Tax Code Ann. § 201.052(a) (1982). The parties' controversy centers upon the calculation of the tax.

Dorchester owns and operates a fractional working interest in a number of gas wells located in the West Panhandle field in Carson and Gray Counties. On July 1, 1952, Dorchester and Northern Natural Gas Company executed a contract by which Dorchester sold to Northern the gas produced from these fields (Cargray gas). Under the agreement, however, Dorchester retained ownership of the natural gas and liquidable hydrocarbons within the gas. The gas from the wellhead was delivered to Dorchester's Cargray plant where these substances were removed. The residue gas was then delivered to Northern at the tailgate of the Cargray plant.

Under the contract, Northern paid Dorchester $0.30 per thousand cubic feet (mcf) of gas delivered. Dorchester promised that after extraction, the gas delivered to Northern would have an average value of 1000 british thermal units (btu) per cubic foot. Northern retained the right to refuse delivery of gas that did not meet this standard.

In September 1977, Dorchester and Northern amended their contract. Under the new terms, Dorchester was entitled to extract additional liquids from the gas, reducing the heating content of the residue gas to not less than 900 btu per cubic foot. Because of the reduction in heating content of the gas, the parties renegotiated the method of compensating Northern. Dorchester proposed that Northern pay a lower price for the gas, reducing the purchase

price proportionately to the reduction in btu:

amended price per mcf = $0.30 × 900,000 ÷ 1,000,000 = $0.27.

Northern rejected Dorchester's proposal. Thereafter, the parties finally agreed that the payments would not change but that Dorchester would furnish additional volumes of gas (make-up gas) to compensate for the reduction in heating content of the residue gas. The amount of make-up gas would be in an amount to raise the average btu of all gas delivered to 1000 btu per cubic foot. Dorchester obtained make-up gas from the Schoenhals No. 1 Well that was operated by one of its affiliates.[1]

The Comptroller performed an audit of Dorchester for the period of October 1, 1977 through September 30, 1981, and determined that Dorchester owed taxes and penalties. Dorchester paid the demanded sum under protest and thereafter filed its suit for recovery in district court.

The Comptroller urged and the district court determined that gas production taxes should be paid in accordance with the above-stated formula. Dorchester argues that the market price should be calculated by subtracting from the existing contract price any production or marketing costs, including the cost of purchasing make-up gas.[2]

The Tax Code provides that a tax is imposed on each producer of gas. Tex.Tax Code Ann. § 201.051 (1982). The tax is based on the market value of gas produced and saved in this state by the producer. Tex.Tax Code Ann. § 201.052 (1982). The market value is the value of the gas at the mouth of the well from which it is produced. Tex.Tax Code Ann. § 201.101 (1982). The predecessor statute of section 201.101 has been interpreted to mean the "sales price" of the gas. *W.R. Davis, Inc. v. State*, 142 Tex. 637, 180 S.W.2d 429, 432 (1944) (the legislature intended "to make the good faith sale price by the producer to

the initial purchaser the standard of value on which the purchaser's liability to the State for taxes must be computed."); *Calvert v. Union Producing Co.*, 402 S.W.2d 221, 225 (Tex.Civ.App.1966, writ ref'd n.r.e.).

■ The appropriate base for calculating the tax, then, is the negotiated contract price between the purchaser and the producer, Northern and Dorchester, absent proof of bad faith, fraud or collusion. *Union Producing Co.*, 402 S.W.2d at 225. The burden to prove bad faith, fraud or collusion, however, rests on the State, *id.*, and in this appeal there is no contention that the contract was other than an arms-length agreement.

■ The tax base may be altered by other factors. If the gas is not sold at the well-head, the costs of transportation and processing, incurred downstream from the wellhead, are deducted in determining the sale price. *Mobil Oil Co. v. Calvert*, 451 S.W.2d 889, 892 (Tex.1970). Moreover, the Comptroller has expressly provided that marketing costs are deductible from the producer's gross receipts when determining the market value of the gas. 34 Tex. Admin.Code § 3.15 (West Nov. 15, 1988). The Comptroller has defined marketing costs to include the costs for compressing, dehydrating and sweetening the gas sold as well as the costs of delivering the gas to the purchaser. *Id.* In other contexts, the marketing costs associated with gas sales include the costs of transporting the gas, treating the gas to make it marketable, and moving the gas to the market. 2 Kuntz, *Oil and Gas* § 26.7(n) (1989). Marketing costs must be deducted because the producer adds these costs into the price of the gas. To the extent, then, that the sale price exceeds the value of the raw material, the amount must be reduced.

■ The summary judgment proof is that the make-up gas was additional consid-

---

**1.** Dorchester paid gas production taxes on the make-up gas.

**2.** The parties stipulated that if Dorchester's calculation is deemed correct, Dorchester should recover $87,071.15 in taxes; $8,707.06 in penal-

ty; $44,619.27 in interest; and, pro rata interest earned on this amount from June 5, 1986 until the date of payment by the Treasurer pursuant to Tex.Tax Code Ann. § 112.060 (Supp.1990).

eration for the new terms of appellant's contract with Northern. The parties stipulated that "Dorchester was also required *under the amended contract* to furnish additional volumes of gas ("make-up" gas) to compensate Northern for shrinkage below 1000 btu per cubic foot...." Moreover, the contract amendment, attached to the parties' joint stipulations, expressly provides for the delivery of make-up gas with the Cargray gas so that the gas delivered to Northern meets the required heating value.

In our view, the $0.30 contract price serves as the base for taxation. The State's argument attempts to rewrite the contract in asserting that the tax base should be $0.27. This figure is not based on the contract price, nor does the three cent reduction bear any relationship to recognized tax deductions (e.g., marketing and production costs) from the sale price. In contrast, the cost of the Schoenhals gas is a marketing cost. Dorchester has shown as a matter of law that if it did not "add" the Schoenhals gas to the Cargray gas, the gas would not meet the requirements for purchase by Northern. Under the terms of the contract Northern could refuse delivery in such case. Dorchester is, in effect, treating the Cargray gas (by increasing the total btu through addition of make-up gas) for purposes of its sale to Northern.

The judgment of the district court is reversed and the cause is remanded with instructions that the district court render judgment for appellant in accordance with the parties' stipulation. *Tobin v. Garcia,* 159 Tex. 58, 316 S.W.2d 396 (1958).