ENRON OIL & GAS COMPANY,
Appellant (Intervenor),

v.

DEPARTMENT OF REVENUE AND TAXATION, STATE OF WYOMING; Nancy Freudenthal, Marvin Applequist and Charles Brown, III, Commissioners thereof, Appellees (Defendants).

W.A. MONCRIEF, Jr., Appellant (Plaintiff),

v.

DEPARTMENT OF REVENUE AND TAXATION, STATE OF WYOMING; Nancy Freudenthal, Marvin Applequist and Charles Brown, III, Commissioners thereof, Appellees (Defendants).

Nos. 91–3, 91–4.

Supreme Court of Wyoming.

Nov. 18, 1991.

---

7. "No person shall be deprived of life, liberty or property without due process." Wyo. Const. art. 1, § 6.

8. *See* majority at ——.

Loyd E. Smith and J. Kent Rutledge of Lathrop, Rutledge & Michael, Cheyenne, Dante L. Zarlengo, Denver, Colo., for appellant Enron Oil & Gas Co.

Morris R. Massey and Peter J. Young of Brown & Drew, Casper, for appellant Moncrief.

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, Sr. Asst. Atty. Gen., Cheyenne, for appellees.

Before URBIGKIT, C.J., THOMAS, CARDINE and GOLDEN, JJ., and BROWN, C.J., Retired.

GOLDEN, Justice.

In this case, we review a summary judgment entered by the district court which determined the Department of Revenue and Taxation (Department) could, in accordance with governing Wyoming statutes, properly charge severance taxes on ad valorem tax reimbursements received by Enron Oil & Gas Company (Enron) and W.A. Moncrief, Jr. (Moncrief), received from purchasers of their natural gas products.

We affirm.

## ISSUES

Enron raises this issue:

Did the trial court err in ruling that ad valorem tax reimbursements received by appellant [Enron] from its natural gas purchasers are subject to severance tax under Wyo.Stat. §§ 39–6–301, et seq.

Moncrief states the issue this way:

The final order from which this appeal is taken requires severance taxes to be paid on the value of the purchasers' reimbursements to natural gas sellers of ad valorem production taxes paid by the sellers. The resulting issues which are presented to this court can be stated as follows:

(1) Whether, in construing the severance tax statutes as requiring the tax to be paid on the value of ad valorem reimbursements, the District Court erred in disregarding the receipt driven reporting and payment requirements of these statutes?

(2) Whether the reimbursements are required to be included and reported as an element of value received, on which the severance tax must be computed and paid?

In his reply brief, Moncrief restates the issue thus:

Assuming *arguendo* that ad valorem tax reimbursements are a component of value for which the gas is sold, must this component have been returned as part of the gross revenues received or credited for sale of the gas and the severance tax calculated and paid thereon?

In defense of the favorable ruling it received from the district court, the Department perceives the issue to be:

Did the district court err in declaring that ad valorem tax reimbursements are part of the fair cash market value of natural gas for Wyoming severance tax purposes?

## FACTS AND PROCEEDINGS

The significant procedural events are that Moncrief filed a complaint, pursuant to the Wyoming Uniform Declaratory Judgments Act, W.S. 1–37–101, et seq. (June 1988 Repl.), seeking a ruling that W.S. 39–6–301 et seq., (1985 Cum.Supp.)[1] does not authorize or permit imposition of severance taxes on reimbursements paid by natural gas purchasers to gas producers for county ad valorem taxes paid by the producers. The Department answered the complaint on May 10, 1990, and, shortly thereafter, Enron was permitted to intervene in the proceedings. All parties filed motions for summary judgment, and on October 31, 1990, the district court granted summary judgment in favor of the Department. Because of its thorough treatment of the issues, we shall refer to the district court's decision letter in more detail in our discussion and resolution of this appeal.

The dispute arose upon audit of production from units operated by Moncrief from January 1, 1979 through December 31, 1986. Moncrief admitted that, in the past, he paid severance taxes on severance tax reimbursements he himself received, as well as taxes for other interest owners in his capacity as a unit operator. However, he had not paid severance taxes on reimbursements received for ad valorem taxes though he had received, or had invoiced, some purchasers for those taxes as provided for in his sales contracts. By letter dated January 26, 1990, Moncrief was informed that he owed the sum of $2,367,147 in additional severance taxes, interest and penalties.

Enron was audited for production for the period 1984 through 1986 and it too had paid severance taxes on severance tax reimbursements, but not on ad valorem tax reimbursements. By letter dated February 1, 1989, Enron was informed that it owed an additional assessment of $671,925 in taxes, interest and penalties.

During the years 1979 through 1986, it was the policy of the Department to include both severance tax and ad valorem tax reimbursements in the value of the gas for severance tax purposes.

## STANDARD OF REVIEW

In the resolution of these issues we employ our usual tests for construing a statute. *Vandehei Developers v. Public Service Commission of Wyoming*, 790 P.2d 1282, 1285 (Wyo.1990); *BHP Petroleum Co., Inc. v. State*, 784 P.2d 621, 624–27 (Wyo.1989); and *see Amax Coal Company v. Wyoming State Board of Equalization*, 819 P.2d 834 at 837–838 (Wyo.1991); *Amax Coal Company v. State Board of Equalization*, 819 P.2d 825, 828–829 (Wyo.1991).

## DISCUSSION

Both Moncrief and Enron sell natural gas. The natural gas industry is regulated by the federal government, in part by the Natural Gas Policy Act (NGPA), 15 U.S.C.A. §§ 3301 et seq. (West 1982). The general rule is that producers may not sell natural gas for more than the maximum price set under the NGPA. However, 15 U.S.C.A. § 3320 provides certain exceptions:

§ 3320. **Treatment of State severance taxes and certain production-related costs**

(a) **Allowance for State severance taxes and certain production-related costs.**—Except as provided in subsection (b) of this section, a price for the first sale of natural gas shall not be considered to exceed the maximum lawful price applicable to the first sale of such natural gas under this part if such first sale price exceeds the maximum lawful price to the extent necessary to recover.—

(1) State severance taxes attributable to the production of such natural gas and borne by the seller, but only to the extent the amount of such taxes does not exceed the limitation of subsection (b) of this section; and

---

1. These statutes have been amended several times in the intervening years; however, for purposes of evaluating the issues raised herein we rely on the statute which governed for the relevant tax years.

(2) any costs of compressing, gathering, processing, treating, liquefying, or transporting such natural gas, or other similar costs, borne by the seller and allowed for, by rule or order, by the Commission.

**(b) Limitation on State severance taxes.**—The State severance tax allowable under subsection (a)(1) of this section with respect to the production of any natural gas may not include any amount of State severance taxes borne by the seller which results from a provision of State law enacted on or after December 1, 1977, unless such provision of law is equally applicable to natural gas produced in such State and delivered in interstate commerce and to natural gas produced in such State and not so delivered.

**(c) Definition of State severance tax.**—For purposes of this section, the term "State severance tax" means any severance, production, or similar tax, fee, or other levy imposed on the production of natural gas—

(1) by any State or Indian tribe (as defined in section 3316(b)(2)(B)(ii) of this title); and

(2) by any political subdivision of a State if the authority to impose such tax, fee, or other levy is granted to such political subdivision under State law.

Wyoming's severance taxes and ad valorem property taxes may be reimbursed in accordance with the NGPA. Enron and Moncrief concede that they pay severance taxes on severance tax reimbursements, but claim they should not have to pay them on ad valorem tax reimbursements because

**2. § 39–2–202. Valuation of mine products; exemption for collection wells.**

(a) Based upon the information received or procured pursuant to W.S. 39–2–201(b) or (c), the board shall annually value the gross product for the preceding calendar year, in appropriate unit measures of all mines and mining claims from which valuable deposits are produced, at the fair cash market value of the product at the mine or mining claim where produced, after the mining or production process is completed.

(b) The mining or production process is deemed completed when the mineral product is removed from the pit, shaft, mine or well and

of the peculiar nature of that tax. All parties agree that the Department's assessments must represent the "fair cash market value" of the products assessed. W.S. 39–2–202(a) and (b) [2], and 39–6–301(a)(iv) [3].

In support of its argument that the governing Wyoming statutes are ambiguous and, consequently, required to be construed in a manner most favorably to the taxpayer, Enron cites a New Mexico statute. However, the citation is only to an unidentified excerpt from the following (excerpt underlined):

I. The taxable value to be reported for severed and saved uranium-bearing material is the sales price per pound of the content of $U_3O_8$ contained in the severed and saved or processed uranium, regardless of the form in which the product is actually disposed of, reduced by fifty percent for the purposes of Section 7–26–7 NMSA 1978. It is presumed, in the absence of preponderant evidence of another value, that the sales price means the total amount of money and the reasonable value of other consideration received, or either of them, for the severed and saved uranium ore or processed uranium "yellowcake" concentrate without deduction of any kind. However, if the severed and saved uranium ore or "yellowcake" concentrate is not sold as ore or concentrate, the sales price shall be the value of $U_3O_8$ ore or "yellowcake" concentrate represented in the final product.

N.M.Stat.Ann. § 7–26–4(I) (1978) (1986 Repl.).

Enron says Wyoming should have used language like that underscored above if the

prior to any benfication [beneficiation] or further processing, is placed in storage prior to transportation to market, or in the case of natural gas, in the pipeline for transportation to market.

**3.** W.S. 39–6–301(a)(iv) reads:

"Value of gross product" means the valuation of the gross product for the preceding calendar quarter of all mines and mining claims as calculated on the same basis as is prescribed by W.S. 39–2–202 for the determination by the department of the value of the gross product for the preceding calendar year.

legislature, in fact, intended to comprehend ad valorem tax reimbursements in the severance tax. That statute has no pertinence to the argument Enron has propounded. The New Mexico statute which is most closely relevant is N.M.Stat.Ann. § 7–26–4(B) which provides:

B. For all natural resources except potash or potash products described under Subsection C of this section, molybdenum or molybdenum products described under Subsection D of this section, copper, lead or zinc described in Subsection E of this section, gold described in Subsection F of this section, silver described in Subsection G of this section, coal and uranium, the gross value of the natural resource is the sales value of the severed and saved product at the first marketable point without any deductions.

We are hard pressed to identify a difference, much less a distinction or an ambiguity, based on a comparative study of New Mexico's assessment standard. If anything, Wyoming's statute is clearer and more directly to the point, especially when read in light of Wyoming's pertinent rules and regulations, as well as the instructions which have been provided to these taxpayers on a regular basis.

We will quote the district court's paraphrase of Enron and Moncrief's position because it is ably constructed and is as fair an assessment of it as can be made:

The statute [W.S. 39–6–301(a)(iv)] requires that the tax be based on the value of gas produced during the quarter preceding the computation of the tax. This being the case, only the unit volume of price may be counted as part of the value because the ad valorem tax reimbursement is not made to the producer by the buyer until substantially after the time that the tax is computed and paid on the basis of the gas produced during the immediately preceding quarter. This is not the only statutory phrase which requires that the valuation be fixed as of the time the gas is produced.

The statute [W.S.39–2–202] requires the computation of value to be at the time of production and defines that, with regard to natural gas, as the point at which the gas is in the pipeline ready for transportation to market. Since the tax reimbursements are not received until a time well after that at which the gas is placed in the pipeline and ready for market, that component of the sales price should not be included. Similarly, the timing of the reporting and payment of ad valorem taxes does not coincide with the time of production of gas.

Ad valorem taxes are computed and paid by the producer and reimbursed to him by the buyer substantially after the time of production of the gas because that is the way the ad valorem tax statutes and the collection system operates. This means that in order to compute the severance tax on the gas produced during the immediately preceding quarter, the producers would necessarily be required to estimate the amount of the tax reimbursement and the statute does not expressly require estimation and prepayment, nor does it authorize the Department to require it. Also important is the statute's use of the word "cash."

When one refers to an item's cash value, that means its value right then and there, not the value it might have at some other time. So, that portion of the total amount of money to be received by the producer by way of tax reimbursements, being a deferred payment, that is a payment that will be made later, that component may not be included. It is not part of the "cash" value. Putting all of these things together, the statutes simply don't permit the Department to require inclusion of the ad valorem tax reimbursements as part of the value of the gas and the law allows the imposition of only those taxes expressly and clearly included in the statutes.

■ We agree with the district court. These arguments fail to demonstrate an ambiguity in, or a misconstruction of, the statutes, or an error in the assessment process employed by the Department. Again, quoting from the district court's decision letter:

The issue is the value of gas as measured by what the seller demands and

the buyer pays. The fact that producer will receive the money after the quarter in which the gas is produced and long after the gas was actually in the pipeline are facts not material to ascertainment of the FCMV [fair cash market value] of the gas as of those times. This is so because the plain language of the statutes is that they require a measurement of value as of the time the gas is produced, without regard to when the producer might receive the proceeds from its sale. Moreover, it is evident that the value of the gas to purchasers is not just the price of the gas itself. Purchasers, at least in the instances that are at issue here, are clearly willing to pay not only the maximum price permitted by the NGPA, but also a price enhanced by the reimbursement of both the severance and ad valorem taxes assessed by the State of Wyoming.

■ Enron also contends that the existence of divergent contentions concerning the meaning of a statute is evidence of ambiguity. Enron and Moncrief have argued somewhat different "interpretations" (as opposed to constructions) of the statute. *See Basin Electrical Power Cooperative v. State Board of Control,* 578 P.2d 557, 561 (Wyo.1978). That argument fails simply because the divergent interpretations articulated in their arguments are just that, divergent "interpretations," not divergent, but credible "constructions" of the statutes. In addition, Enron claims it could be subjected to "circular nonsense," an ever spiraling tax, and taxes on taxes. This argument is based on a conception that once it pays severance tax on the ad valorem taxes then it will be reimbursed and be required to pay severance tax on that reimbursement, etc., etc., etc., into infinity. There are no facts in the record to support this argument.

Much ado is made by all parties about the relevance of the authorities cited in the various briefs. We have reviewed The Council of Petroleum Accountants Societies of North America Bulletins contained in the record, as well as the case citations, including those from The Interior Board of Land Appeals. All are instructive in at least some small measure, but none of those disputed authorities is truly relevant to the construction of the Wyoming statutes at issue here. Suffice it to say, the Wyoming statutes themselves, read in conjunction with a lengthy array of Wyoming cases dealing with the construction of taxation statutes, convince us that we need not look beyond our own borders for the resolution of the issues present in the instant case.

In conclusion, tested by our well-established rules governing the construction of taxation statutes and correlative Department rules and regulations, we hold that the Department may, pursuant to the governing statutes discussed above, include ad valorem tax reimbursements as a component in the assessment process for determining the fair cash market value of minerals, including natural gas.

Affirmed.