633 So.2d 1028 (1994)
3300 CORP.
v.
C.A. MARX, in his Capacity as Chairman of the Mississippi State Tax Commission.
No. 91-CC-01254.
Supreme Court of Mississippi.
March 10, 1994.
Thomas L. Kirkland, Jr., William T. Wilkins, Kirkland Barfield & Moore, Jackson, for appellant.
Bobby R. Long, MS State Tax Com'n, Leslie R. Brown, Jackson, for appellee.
Before DAN M. LEE, P.J., and McRAE and SMITH, JJ.
McRAE, Justice, for the Court:
This appeal arises from a November 26, 1991, order of the Chancery Court for the First Judicial District of Hinds County granting the Tax Commission's motion for *1029 summary judgment against 3300 Corp., a taxpayer. In a case of first impression, we are asked to consider whether, pursuant to Miss. Code Ann. § 27-25-701 (1972) and Miss. Code Ann. § 27-25-703 (1972), a reimbursement for severance tax by the purchaser pursuant to a natural gas purchase agreement is considered part of the "sales price" of the gas and, therefore, is itself taxable. Finding that the Tax Commission properly considered the severance tax reimbursement as part of the taxable price of the natural gas, we affirm the chancellor's judgment.

I.
3300 Corp. is an interest owner in certain natural gas wells located in Rankin County's Thomasville Field and the successor-in-interest to the rights and interests of Mississippi Mining & Mineral Company under a gas purchase contract with Southern Natural Gas Company. The chancellor found, as a matter of law, that the Commission had properly assessed severance taxes against 3300 Corp. and the operator of the well, Pursue Energy Corporation, on a portion of a March, 1985 settlement from Southern Natural.[1] The disputed tax, which 3300 Corp. has paid, was levied on that part of the settlement which was designated as a reimbursement of severance tax pursuant to the gas purchase contract.
As the result of an audit made after the settlement, the Mississippi State Tax Commission notified Pursue on June 6, 1988, that a gas severance assessment of $665,681.50 was due for the period beginning February 1, 1985, and ending December 31, 1987. 3300 Corp.'s share of the assessment amounted to $386,830.86. Pursue petitioned the Board of Review, which affirmed the assessment on September 28, 1988, and reassessed the obligation at $668,538.35. Pursue and 3300 Corp. appealed the Board of Review's decision to the full Commission, which affirmed the Board's assessment on June 21, 1989. In so ruling, the Commission found that "the monies received from Southern Natural Gas Company by the producers in settlement of their contractual litigation constitute a part of the sale price of the gas produced during the audit period and thereby would be properly subject to severance taxes."
Its administrative remedies exhausted, 3300 Corp. filed suit against C.A. Marx, Chairman of the Mississippi Tax Commission, in the Hinds County Chancery Court on October 25, 1989. The corporation sought a refund of severance taxes which it had paid, but alleged had been improperly charged to it.
On June 18, 1991, 3300 Corp. filed a motion for summary judgment, asserting that $317,998.98 of the assessment was based on an erroneous interpretation and application of Miss. Code Ann. § 27-25-701(d). 3300 Corp. argued that the reimbursement of severance taxes pursuant to its contract with Southern Natural did not constitute part of the "sale price" of the natural gas as contemplated by § 27-5-701.
Marx, in his capacity as Chairman of the Tax Commission, filed a cross-motion for summary judgment on October 1, 1991. The Commission argued that under the terms of the contract between 3300 Corp. and Southern Natural, the reimbursement of severance taxes which had been paid by the seller was part of the "sale price" of the gas as defined by § 27-25-701 and thus taxable pursuant to § 27-25-703(2).
After hearing arguments on the motion and considering the pleadings and exhibits, the chancellor found, as a matter of law, that the Tax Commission was entitled to summary judgment in its favor. The court further found that the intent of the parties, as expressed in the language of the contract, was controlling, and held that Southern Natural's reimbursement for the severance taxes paid by the seller constituted part of the sales price and was taxable pursuant to Miss. Code Ann. § 27-25-703.

*1030 II.
Pursuant to Miss. Code Ann. § 27-25-703 (1972 and Supp. 1992), an annual privilege tax, the so-called severance tax, is levied upon those persons in the business of producing or severing natural gas. The amount of the tax is measured by "the value of the gas produced" and assessed at a rate of six percent "of the value thereof at the point of production." Miss. Code Ann. § 27-25-703. The term "value" as used in § 27-25-703 is defined by § 27-25-701(d) as:

the sale price, or market value, at the mouth of the well. If the gas is exchanged for something other than cash, or if there is no sale at the time of severance, or if the relation between the buyer and seller is such that the consideration paid, if any, is not indicative of the true value or market price, then the commissioner shall determine the value of the gas subject to tax, considering the sale price for gas of gas of like quality in the same or nearest gas-producing field.
The parties agree that 3300 Corp.'s sale of gas to Southern Natural was made pursuant to a competitive contract, negotiated at arm's length. Therefore, the value of the taxable gas is its sale price or market value "at the mouth of the well."
The Tax Commission's pleadings infer a long-standing policy of imposing severance taxes on "the total receipts by a producer of natural gas." Further, the Commission stated in its Responses to Interrogatories that its expert witnesses were expected to testify that it has "always interpreted the severance tax law as requiring that severance tax be paid on the full value or sales price without any deductions for severance taxes or other like items."
At issue is whether any severance taxes reimbursed by the buyer to the seller, pursuant to a gas purchase contract, constitute part of the "sale price" or "market value" of the gas. This court has not previously construed "sale price" or "market value" in the context of § 25-27-701(d). 3300 Corp., which asserts that the severance tax reimbursement is not part of the sale price or market value of the gas, approaches the question as an issue of statutory construction. The Tax Commission, on the other hand, bases its contention that the reimbursement is part of the sales price solely on its interpretation of the gas purchase contract. The few other jurisdictions which have considered whether a tax reimbursement is part of the sales price or market value of a natural resource have looked primarily at the controlling statutes, but have also considered the language of the purchase contract.

A. 3300 Corp.'s Statutory Construction Argument
3300 Corp. asserts that taxing the reimbursement of severance taxes is illogical and creates an unworkable standard for measuring the value of gas sold in Mississippi. It argues that the interpretation espoused by the Commission and affirmed by the chancellor "results in a never ending cycle in which the taxpayer must first attempt to determine its sales price, then calculate the severance tax owing, then add back the reimbursement, then recalculate the severance the severance taxes owing, then add back more reimbursement... ."
3300 Corp. further contends that the Commission and the chancellor misconstrued and incorrectly applied the definition of "value" as set forth in Miss. Code Ann. § 27-25-701(d). 3300 Corp. suggests that the chancellor and the Commission have confused the "sale price" subject to severance tax with the "gross proceeds of sales" subject to sales tax pursuant to Miss. Code Ann. § 27-65-15. "Gross proceeds of sales" is defined in § 27-65-3(h) as follows:
[t]he value proceeding or accruing from the full sale price of tangible personal property including installation charges, carrying charges, or any other addition to the selling price on account of deferred payments by the purchaser, without any deduction for delivery charges, cost of property sold, other expenses or losses, or taxes of any kind except those expressly exempt by this chapter.
The corporation asserts that had the legislature intended to impose a severance tax on gross proceeds, it would have used same *1031 language it employed when levying a sales tax on the gross proceeds of natural resource sales. 3300 Corp. mistakenly bases its theory of legislative intent on an analysis of the legislative history of House Bill No. 23, which, it states, is the predecessor to § 27-25-701. However, House Bill No. 23 was the predecessor to § 27-25-501, which imposes a severance tax on oil, not on natural gas. The correct legislation is House Bill No. 485, adopted by the legislature in 1948. While the language is similar to that used in House Bill No. 23, especially in its definition of "value," there is one difference. House Bill No. 23, indeed, drew a distinction between "gross proceeds" and "sales price," as 3300 Corp. argues, by providing an amendment to the sales tax statute. In 1948, however, when House Bill No. 485 was adopted, the same § 2-a of Chapter 119, Laws of 1934, was amended by House Bill No. 573 "to remove the imposition of a sales tax on the production of natural gas." That the 1948 law exempted natural gas from the sales tax takes the wind from the sails of 3300 Corp.'s argument that the legislature really intended to distinguish between the bases for calculating natural gas severance and sales taxes.
Finally, 3300 Corp. argues that the chancellor erred in finding that the intent of the parties as evidenced by the language of the contract was the key to determining whether the severance tax reimbursement constituted part of the sale price. It suggests that such an approach would lead to inconsistent results and encourage parties to word their contracts so as to avoid tax liability.

B. The Tax Commission's Contract Interpretation Argument
The Tax Commission contends that its interpretation of § 27-25-703 and, consequently, of the definition of "market value" or "sale price," should be given great deference by this Court. Adkins v. Hampton, 586 F.2d 1070 (5th Cir.1978); Gully v. Jackson International Co., 165 Miss. 103, 145 So. 905, 907 (1933); L.H. Conard Furniture Co. v. Mississippi State Tax Commission, 160 Miss. 185, 133 So. 652, 655 (Miss. 1931). It suggests that whether the sale price includes the tax reimbursement is properly a matter of contract interpretation rather than statutory construction and asserts that "[t]he gas purchase contract, by its own terms, clearly included the reimbursement for severance taxes as part of the consideration to be paid by the purchaser for the gas." It astutely observes that the reimbursement was "simply a novel way to increase the sales price of the gas."
Article 7 of the gas purchase contract contains provisions for the pricing of gas pursuant to the agreement. Section 1 of Article 7 provides as follows:
Subject to the further provisions of this Article 7 and Article 9 buyer agrees to pay seller, effective on the date of first deliveries, for each MMBTU of Residue gas delivered hereunder, the highest permitted or prescribed maximum lawful price authorized to be paid by Buyer and collected by Seller pursuant to the Policy Act and the regulations, orders or rulings promulgated thereunder, including without limitation all allowable periodic escalation adjustments (retroactive or otherwise). Buyer shall reimburse Seller for 100% of taxes as provided in Article 8 hereof.

Section 2 of Article 7, which provides for price increases pursuant to regulatory or legislative authority, also includes the tax reimbursement clause. The third major section of Section 7, which provides methods of price redetermination in the event of the absence of regulatory or legislative controls, does not include a reimbursement clause.
Article 8 of the gas purchase contract provides for the payment and reimbursement of taxes. The clause covers any tax, license or fee levied upon "the act, right or privilege of production, severance, gathering, transportation, handling, sale or delivery of gas which is measured by the volume, value or sales price of the gas in question." Pursuant to Section 3 of Article 8, the buyer (Southern Natural) agrees to reimburse the seller (Pursue Energy, the unit operator and ultimately, 3300 Corp. the interest owner) for 100% of the taxes imposed upon and paid by the seller.
Reading Articles 7 and 8 together, the Tax Commission concluded that it was the intent of the parties to consider the reimbursement as part of the purchase price.

*1032 C. Other Jurisdictions

Although the inclusion of contract provisions requiring the purchaser to reimburse the seller for any taxes which have been paid on the severed resource is fairly common, few jurisdictions have considered whether such reimbursements constitute part of its price or value or the basis for calculation of tax liability. The inquiry in these cases has focused on the language of the controlling statutes, not the language of the contract. Although we look also at the contract, we find that the focus indeed belongs on the controlling statutory language.
Natural gas prices are subject to control by the Natural Gas Policy Act (NGPA), 15 U.S.C.A. § 3301 et seq. (1982). As explained in Enron Oil & Gas Co. v. Department of Revenue and Taxation, 820 P.2d 977 (Wyo. 1991), "[t]he general rule is that producers may not sell natural gas for more than the maximum price set under the NGPA." Id. at 979. 15 U.S.C.A. § 3320, however, provides exceptions to price floors and ceilings in the form of an allowance for state severance taxes paid and certain production-related expenses.
In Cimmaron Coal Corporation v. Department of Revenue, Commonwealth of Kentucky, 681 S.W.2d 435 (Ky. 1984), the Kentucky court found that reimbursement for coal severance taxes constituted part of the "gross value" of the coal for purposes of severance tax computation. Id. at 437. A contract between Cimmaron Coal, the taxpayer, and its major purchaser expressly provided that the cost of the coal would be adjusted to reflect any changes in the severance tax laws. Id. In 1972, the Kentucky General Assembly adopted a coal severance tax equivalent to four percent (4%) of the "gross value" of the severed coal. Id. Consequently, the price of the coal under the contract was, indeed, adjusted to reflect the four percent tax. The Kentucky court rejected the taxpayer's argument that adding the reimbursement to the "gross value" figure would result in double taxation. Id. Without pausing to analyze the language of the coal purchase contract, the court looked directly to the intent of the legislature and the statutory definition of "gross value."
Whether the additional compensation is included in gross value depends on the intent of the Legislature in enacting 1972 Ky. Acts, Chap. 62, Part II, § 1(6)(a), which defines "gross value" as applicable to the facts in this case as follows:
For coal severed and sold during a reporting period, gross value is the amount received or receivable by the taxpayer.

The plain meaning of the statute is that amounts received or receivable by the taxpayer are gross value. This taxpayer received or was contractually entitled to receive the contract price. The contract price was a base price plus 4% after enactment of the severance tax.
The General Assembly's use of the word "gross" would imply the selling price of the coal. If the General Assembly did not mean to include taxes and other costs they would have used a word such as "net."
Id. (emphasis added.)
In Wyoming, where the Department of Revenue and Taxation has an established policy of including both severance tax and ad valorem tax reimbursements in the value of natural gas for severance tax purposes, the court likewise has looked directly to the applicable statutes rather than at the language of individual resource purchase contracts. Accordingly, reimbursement of ad valorem taxes as well as severance taxes, has been found to be part of the "fair cash market value" of natural gas. Enron Oil & Gas Co. v. Department of Revenue and Taxation, State of Wyoming, 820 P.2d 977 (Wy. 1991).[2]
*1033 Rejecting Enron's arguments that the ad valorem taxes were computed and paid long after the gas had been produced and transported to market and that a deferred payment could not be part of the "fair cash market value," the court construed the value of the gas as follows:
The issue is the value of the gas as measured by what the seller demands and the buyer pays. The fact that [the] producer will receive the money after the quarter in which the gas is produced and long after the gas was actually in the pipeline are facts not material to ascertainment of the FCMV [fair cash market value] of the gas as of those times. This is so because the plain language of the statutes is that they require a measurement of value as of the time the gas is produced, without regard to when the producer might receive the proceeds from its sale.
Moreover, it is evident that the value of the gas to purchasers is not just the price of the gas itself. Purchasers, at least in the instances that are at issue here, are clearly willing to pay not only the maximum price permitted by the NGPA, but also a price enhanced by the reimbursement of both the severance and ad valorem taxes assessed by the State of Wyoming.

820 P.2d at 981-982.
The Wyoming court, in Cities Service Oil and Gas Corp. (Oxy, USA, Inc.) v. State of Wyoming, 838 P.2d 146 (Wyo. 1992), reiterated that "the `value' of natural gas for tax purposes is the price of the natural gas under the NGPA `enhanced by the reimbursement of both the severance and ad valorem taxes assessed by the State of Wyoming.'" Id. at 152, n. 4, citing Enron, 820 P.2d at 982. Applying the rationale of Enron, the court found that under the "amount realized" provision of state leases, the State was entitled to receive royalties on the value of the NGPA ceiling price plus any reimbursements for ad valorem, severance and conservation taxes. Id. at 154-155. The court explained:
Tax reimbursements are part of the "amount" Oxy "realizes" from the sale of natural gas "at the well," and the State's royalty is properly calculated on the basis of inclusion of the tax reimbursement amount in addition to the "price" Oxy receives under the NGPA for natural gas sold to CSGC.
Id. at 155.
The New Mexico court determined that reimbursement for severance taxes paid on uranium ore or "yellowcake" was part of the taxable value for severance tax purposes in United Nuclear Corporation v. Revenue Division, State of New Mexico, 98 N.M. 296, 648 P.2d 335 (1982). See also, Ranchers-Tufco Limestone Project Joint Venture v. Revenue Division, New Mexico Taxation and Revenue Department, 100 N.M. 632, 674 P.2d 522, 80 Oil & Gas Rep. 203 (1983) (reimbursement for increase in severance tax subject to additional severance tax as part of taxable value). As distinguished from Miss. Code Ann. § 27-25-703, the New Mexico statute speaks in terms of "taxable value." However, the statute itself equates taxable value with sale price. N.M.S.A. 7-26-3(F) (1978) provides as follows:

The taxable value to be reported for severed and saved uranium-bearing material is the sales price per pound of U308 [uranium] contained in the severed or saved or processed uranium, regardless of the form in which the product is actually disposed of. It is presumed in the absence of preponderant evidence of another value, that the taxable value means the total amount of money and the reasonable value of other consideration received, or either of them, for the severed and saved uranium ore or processed uranium "yellowcake" concentrate is not sold as ore or concentrate, the gross value shall be the value of U308 in ore or "yellowcake" concentrate represented in the final product. Taxable value shall be gross value without deduction of any kind.

Id. (emphasis added). The court, therefore, rejected the taxpayer's arguments that the value of the uranium did not necessarily equal the total sales price and that value did not include reimbursed taxes when stated *1034 separately from the price per pound of the mineral. To the contrary, the court stated that "if we were to follow the logic of the taxpayer's argument, we would not be interpreting the existing statutes, we would be legislating a new section, a power we do not have." United Nuclear, 98 N.M. at 300, 648 P.2d at 339.
In finding that the sales price or value included the reimbursement for severance taxes, the New Mexico court focused its inquiry on whether the buyer or the seller bore legal responsibility for the payment of the taxes at issue. Where the tax is imposed on the buyer, and the seller merely functions as a tax collector, the amounts collected by the seller are excluded from the gross sales receipts. United Nuclear, 98 N.M. at 300, 648 P.2d at 339, citing State v. Thoni Oil Magic Benzol Gas Stations, 121 Ga. App. 454, 174 S.E.2d 224, aff'd 226 Ga. 883, 178 S.E.2d 173 (1970). However, where, as in the case sub judice, the legal responsibility for payment of the tax is on the seller, the tax is properly included in the sale price. Id., citing Gurley v. Rhoden, 421 U.S. 200, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975) (constitutional for state to impose tax based on pump price of gasoline which included both state and federal excise tax). That the price of the actual cubic footage of the gas is stated separately from the taxes owed, as in the case sub judice, is irrelevant.[3]United Nuclear, 98 N.M. at 300-301, 648 P.2d at 339-349, citing Lash's Products, Inc. v. United States, 278 U.S. 175, 49 S.Ct. 100, 73 L.Ed. 251 (1929) ("The price is the total sum paid for the goods. The amount added because of the tax is paid to get the goods and for nothing else."); State Tax Commission v. Quebedeaux Chevrolet, 71 Ariz. 280, 226 P.2d 549 (1951); Merchants Cigar & Candy Co. v. City of Birmingham, 245 Ala. 587, 18 So.2d 137 (1944).
Finally, 3300 Corp.'s assertion that the legislature used the term "gross proceeds of sales" as the basis for the sales tax, but neglected to employ the terms "net" or "gross" when establishing the value of resources for severance tax purposes is less than persuasive. Of the jurisdictions which have considered this issue, only the Kentucky statute refers exclusively to "gross" value, which has been construed to mean "amounts received or receivable by the taxpayer." Cimmaron, 681 S.W.2d at 437. In New Mexico, the applicable statute equates taxable value with sales price and finally, almost as an afterthought, with "gross" value. N.M.S.A. § 7-26-3(F). In Wyoming, both severance and ad valorem taxes are considered part of the "fair cash market value" of natural gas without any regard for "gross" or "net" value. Enron, 820 P.2d at 982. In Texas, where severance tax is based on "the market value of gas produced and saved in this state by the producer," no distinction is made between "net" and "gross" values. Dorchester Master Limited Partnership v. Bullock, 794 S.W.2d 554, 109 Oil & Gas Rep. 656 (Tex. App. 1990). Based on these authorities, the existence of statutory language distinguishing between "net" and "gross" values does not appear to be a prerequisite to including any severance taxes reimbursed in the "sale price" or "market value" of the gas.

III.
Based on our interpretation of the applicable statutes and authority from other jurisdictions, we find that the reimbursement received by 3300 Corp. for the severance taxes it had paid should be considered part of the price Southern Natural was willing to pay for the gas, and is, therefore, subject to taxation. This is consistent with our decision in Bass Development Corp. v. Mississippi State Tax Commission, 271 So.2d 432 (Miss. 1973), that an additional premium paid for royalty oil was subject to severance tax.
There being no genuine issues of material fact, we find that the Tax Commission was entitled to summary judgment as a matter of law. Accordingly, we affirm the decision of the chancery court.
AFFIRMED.
*1035 HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
PITTMAN, J., concurs in results only.
NOTES
[1] In June, 1982, Pursue and 3300 Corp., as well as other parties not named in this appeal, filed suit against Southern Natural to enforce various obligations under the 1979 gas purchase contract. Based on the final judgment and settlement agreement, 3300 Corp. allocated its share of the funds received as follows: $903,553.00, payment of interest; $463,267.00, additional gas price; and most relevant to the case sub judice, $2,383,180.00, severance tax reimbursement.
[2] The applicable statute, W.S. Sec. 39-2-202, provides as follows:

Sec. 39-2-202. Valuation of mine products; exemption for collection wells.
(a) Based upon the information received or procured pursuant to W.S. 39-2-201(b) or (c), the board shall annually value the gross product for the preceding calendar year, in appropriate unit measures for all mines and mining claims from which valuable deposits are produced, at the fair cash market value of the mine or mining claim where produced, after the mining or production process is completed.
(b) The mining or production process is deemed completed when the mineral product is removed from the pit, shaft, mine or well and prior to any benfiction [beneficiation] or further processing, is placed in storage prior to transportation to market, or in the case of natural gas, in the pipeline for transportation to market.
[3] Southern Natural's monthly Gas Detail Reports from the production months of February, 1985, through December, 1987, list separately the amounts paid for gas and severance taxes to each seller in the Thomasville Field.