Kye TROUT, Jr., Appellant (Petitioner),

v.

WYOMING OIL AND GAS CONSERVA-TION COMMISSION, Appellee, (Respondent),

Mitchell Energy Corporation, Appellee (Intervenor).

No. 85–280.

Supreme Court of Wyoming.

June 18, 1986.

Harold E. Meier of Schwartz, Bon, McCrary & Walker, Casper, for appellant.

Karen A. Byrne, Asst. Atty. Gen., Casper, for appellee Wyoming Oil and Gas Conservation Com'n.

Houston G. Williams of Williams, Porter, Day & Neville, P.C., Casper, for appellee Mitchell Energy Corp.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

BROWN, Justice.

By an order dated August 16, 1985, and a nunc pro tunc order dated September 1, 1985, the Wyoming Oil and Gas Conservation Commission (hereinafter Commission) approved a plan of unitized secondary recovery operations (unitization) of the Teapot Formation underlying the Mikes Draw unit area. Appellant appeals the unitization plan approved by the Commission. This case was certified by the district court to the Wyoming Supreme Court according to Rule 12.09, Wyoming Rules of Appellate Procedure.

The issues on appeal urged by appellant are:

"1. Are the material findings of the Commission as set forth in the order supported by substantial evidence?

"2. May the Wyoming Oil and Gas Conservation Commission approve a unit formula without evidence be-fore it that the proposed formula protects correlative rights or allocates oil and gas in an equitable manner?

"3. Is the decision of the Wyoming Oil and Gas Conservation Commission arbitrary, capricious and abuse of discretion, or otherwise not in accordance with the law?"

We will affirm.

The Teapot Formation is located in Converse County north of Douglas. After meetings and discussions among the working interest owners concerning unitization, Intervenor, Mitchell Energy Corporation, proposed a Teapot Unit approximately 8.5 miles long by 2.8 miles wide covering approximately 7,385 acres. The appellant, Kye Trout, Jr., is the owner of working interests in leases in three wells located in the proposed unit. Mitchell Energy Corporation owns thirty-five percent of the interest in the unit area.

Counsel for appellant stated that they were not opposed to the unitization and were only opposed to the allocation formula. Appellant's witness, Guy Ausmus, a petroleum engineer, testified that they strongly supported the unit because they did not believe in waste, and if they were to stay out of the unit, that action would constitute waste. This representation by appellant's counsel was apparently considered by the Commission to be a stipulation that unitization would prevent waste. In any event, waste was not an issue before the Commission.

Before the Commission hearing on August 13, 1985, the working interest owners (operators) manifested an interest in unitization, and a technical committee was formed in January 1982 to study its feasibility. After its organization, additional meetings were held throughout the year, resulting in the technical committee report of July 1983. The operators had discussed possible formulas, including a formula proposed by appellant. The operators with interests in wells down the middle of the field would not accept the original oil-in-

place and pore volume parameters favored by appellant, because they did not believe this oil to be recoverable.

In December of 1983, there was a meeting to vote on the formula for allocating unit production to the various tracts. Five different votes were taken. At this meeting a formula proposed by appellant, relying on oil-in-place as a significant factor was rejected. With respect to the Trout formula, Rob Pawlik, a petroleum-reservoir engineer, testified at the Commission hearing that this formula had no chance of receiving the requisite approval of the unit members. Appellant's proposed formula would yield more oil to him, and such oil would have to be taken from the other interest owners. Mr. Pawlik also stated that the formulas were thoroughly discussed before the meeting in December 1983, at which time the votes were taken, and he stated further that by the time of that meeting, the acceptable formula had been narrowed down by the parties and that this was the reason for only five votes. At the close of the meeting a large majority of the operators had substantially agreed on a formula.

It was determined at the Commission hearing that 82.39 percent of the operators and 93.06 percent of the royalty interest owners indicated voluntary joinder of the unit proposed by Mitchell Energy Corporation. After the hearing, the unit formula earlier favored by the operators was confirmed by the Commission, allocating unitization production based on three parameters or factors of varying weight: [1]

| Parameter | Weight |
| --- | --- |
| Last six months production | 47.5% |
| Remaining proved developed producing reserves | 47.5% |
| Original oil-in-place | 5.0% |

Although appellant lists three issues, his appeal is essentially a sufficiency-of-the-evidence argument. Appellant summarized his argument by stating that:

"There was no substantial evidence to support the Commission's findings. The statements of the commissioners at the close of the hearing contradict the findings placed in the order.

"The Commission erred in that there was no evidence whatsoever as to the effect of the formula on correlative rights or that the formula allocated oil and gas in an equitable manner. The Commission did not take into account the effect on correlative rights or the equitable distribution of oil in making its decision.

"The Commission's decision was arbitrary and capricious in that it was based upon a threat from the intervenor, Mitchell Energy Corporation, that it would not produce oil unless its formula were approved.

"The Commission erred in approving a 7,000 acre unit when the evidence was that the operator would only operate a small pilot project."

The rules for reviewing a decision of an administrative agency are well known. Section 16-3-114(c), W.S.1977 (October 1982 Replacement), as amended, provides:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

1. Appellant presented a somewhat different formula at the hearing than he presented at the meeting. In any event, the working interest owners defeated appellant's proposed formula, and the Commission also rejected the similar formula appellant presented to it.

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

In *Board of Trustees of School District No. 4, Big Horn County v. Colwell*, Wyo., 611 P.2d 427, 428–429 (1980), we said:

"For the purpose of reviewing the propriety of the district court's action, we will review the agency action as though the appeal were directly to this court from the agency. We are governed by the same rules of review as was the district court. [Citations.]

"Therefore, we will not substitute our judgment for that of the agency. * * *

" * * * * *

" ' * * * Under this standard [§ 16–3–114(c), W.S.1977 (October 1982 Replacement) ], we do not examine the record only to determine if there is substantial evidence to support the Board's decision, but we must also examine the conflicting evidence to determine if the Board could reasonably have made its findings and order upon all of the evidence before it. * * *"

■ We examine the entire record to determine if there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency, and must uphold the findings on appeal. *Mountain Fuel Supply v. Wyoming Public Service Commission*, Wyo., 662 P.2d 878 (1983). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the conclusions of the agency. It is more than a scintilla of evidence. *Kloefkorn-Ballard Construction and Development, Inc. v. North Big Horn Hospital*, Wyo., 683 P.2d 656 (1984);

*Brasel & Simms Construction Co., Inc. v. State Highway Commission of Wyoming*, Wyo., 655 P.2d 265 (1982); and *Wyoming State Department of Education v. Barber*, Wyo., 649 P.2d 681 (1982).

In his statement of the issue, appellant claims the Commission's decision is contrary to law and not supported by substantial evidence. He does not allege the Commission acted in excess of its jurisdiction, or that it failed to follow the required procedures.

The Commission made findings of fact and conclusions of law in support of its order. Appellant's principal contention is that the evidence was insufficient to support finding Nos. 15, 16, and 17, which state:

"15. Kye Trout (Trout) appeared to protest the application considered herein. Trout's concern is that his leases, which were acquired in 1983, did not receive equity in the participation formula which is based 47.5 percent on the last six months' rate, 47.5 percent on remaining proved developed producing reserves, and five percent (5%) on the volume of original oil-in-place. The Commission finds that the proposed formula does allocate oil and gas in a just and equitable manner to each separately owned tract so far as can be practically determined; that the unitized operation will prevent waste, will protect correlative rights and will substantially increase the amount of produced oil and gas; and that the value of the additional reserves is much greater than the investments required to produce the additional reserves. The operator, Mitchell Energy, had discussed formulas similar to that favored by Trout, but found that an overwhelming majority of the working interest owners would never support such a formula.

"16. Many technical committee meetings and working interest owners meetings have been held since 1982 in arriving at the unitization formula and the parameters therein. The technical exhibits and data of the applicant are found to be true and accurate.

"17. Mitchell Energy's application for a waterflood operation of the Mikes Draw Unit's Teapot Formation should be approved to provide for the increased recovery of hydrocarbons and for the protection of correlative rights."

■ A unit agreement has the effect of forming a single leasehold ownership in the unitized tract. Such agreements are economical because they allow the reservoirs of oil and gas to be produced more exhaustively as a natural unit without the constraints of artificial property lines. *Ego Oil Company, Inc. v. Garner,* 115 Ill. App.3d 82, 70 Ill.Dec. 902, 450 N.E.2d 375 (1983).

■ Unitization means that everyone who has a legal interest in the oil and gas join together in a common plan to gain effective production from a field. *Amoco Production Company v. Ware,* 269 Ark. 313, 602 S.W.2d 620 (1980).

"Unit operation is said to represent development and operation of an oil pool as a unit. It involves the consolidation or merger of all of the interests in the pool and the designation of one or more of the parties as operator. This method of development will permit the location of wells so as to secure the most scientific use of the natural reservoir energy in the production of oil and gas by primary recovery methods. [Citation.] It would also include the location of both induction and production wells so as to secure the most scientific use of artificial energy in the production of oil and gas by secondary or tertiary recovery. * * *". *Parken v. State Corporation Commission of Kansas,* 234 Kan. 994, 677 P.2d 991, 1002 (1984).

The Commission's authority to compel unitization in Wyoming is authorized by § 30–5–110, W.S.1977 (June 1983 Replacement). Under subsection (e)(ii), the Commission must find: "Such unit operation is feasible, will prevent waste, will protect correlative rights, and can reasonably be expected to increase substantially the ultimate recovery of oil or gas."

Correlative rights are defined by § 30–5–101(a)(ix), W.S.1977 (June 1983 Replacement), as

" * * * the opportunity afforded the owner of each property in a pool to produce, so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas, or both, in the pool."

See also, *United Petroleum Exploration v. Premier Resources,* 511 F.Supp. 127 (W.D.Okla.1980); and *Kingwood Oil Company v. Corporation Commission,* Okla., 396 P.2d 1008 (1964).

■ Wyoming is in accord with other states which recognize that correlative rights and the right to produce oil from a pool are limited both by a duty not to injure the pool and a duty not to cause waste. *Gilmore v. Oil and Gas Conservation Commission,* Wyo., 642 P.2d 773 (1982).

Appellant disagrees with finding number 16 and states, "In fact there had not been extensive negotiations." While "extensive" and "many" are imprecise terms, the record reveals that there were negotiations involving interested parties before the unit meeting in December 1983. In our factual recitation we traced the history of negotiations among the operators beginning in January 1982 and continuing until August 1985. We cannot say that the Commission was wrong in its characterization of the negotiations.

■ The principal thrust of this appeal is appellant's contention that his correlative rights were not protected by the Commission's unitization order. Mr. Norris, a consulting geological engineer, was employed by the technical committee to do the geological background work prior to and part of the unitization committee work. Both Mr. Norris and Mr. Pawlik testified that the formula selected was fair and equitable to all parties for our purposes. This is equivalent to saying that the formula protects correlative rights. The purpose of the allocation formula is to assign to the various tracts a fair share of *all* unit production, wherever the wells are located. What is fair and equitable is to some extent

in the eye of the beholder; however, both Norris and Pawlik were cross-examined regarding the basis of their conclusion that the formula was fair and equitable. Mr. Pawlik explained that original oil-in-place was not heavily weighted because such oil was not recoverable. He also thought it significant that an overwhelming majority of interest parties favored the formula agreed upon.

The Commission also heard a witness for appellant, Mr. Asmus, discuss appellant's proposed formula which gave more weight to oil-in-place. The Commission simply decided that the oil-in-place parameter "should be given only slight" weight.

Counsel for appellant also argued that the Commission itself did not believe that the approved formula set forth in the unit agreement protected correlative rights. The commissioners in effect said that where the statutory eighty percent approval is received, then the Commission has authority to approve the unit. Substantially, the same problem was present in the Gilmore case. There, we said:

> "The operators held various meetings at which they voted on formulae to be used in allocating production under unitization. The 81 working interest owners considered a total of 71 formulae. Naturally, each of the owners wanted parameters favorable to them and wanted more weight to be given these parameters. After voting on almost 60 formulae, the owners were frustrated in their attempt to find one that would receive the statutory approval. As a result, they examined their voting records and used a computer to arrive at an equitable compromise formula that could receive the required approval. The resulting formula number 67 at issue here, received 75.89 percent approval. It appeared that no greater percentage would approve any formula proposed." Id., at 775.

Arguably, the Commission was not entirely happy with the formula favored by the majority. However, as in Gilmore, it was realistic. Substantially the same situation exists in this case. It was clear from the evidence that no other formula proposed would get the requisite eighty percent approval. The statutory requisite approval could not be obtained on any formula using oil-in-place as a substantial parameter. This was obvious to all concerned and had been discussed before the vote; the vote merely confirmed what all parties had known from their previous discussions.

We quoted § 30–5–110(f), W.S.1977 (June 1983 Replacement), in deciding to affirm the Commission's order approving the unit in the Gilmore case. About the only difference we can see in this case and Gilmore is that in the latter about sixty formulae were voted on, while five were voted on here. This difference under the circumstances is not significant.

> " * * * [W]e do not think it would be fair or equitable to permit a very small minority of small fractional interest owners in this common source of supply of hydrocarbons to prevent the Board and the overwhelming majority of the operating and royalty owners from pursuing a unitization program designed to obtain a maximum recovery from the field. * * "

*Corley v. Mississippi State Oil and Gas Board,* 234 Miss. 199, 105 So.2d 633 (1958).

> " * * * In most instances it is impossible to use a formula which will apply equally to all persons producing from a common source. In striking a balance between conservation of natural resources and protection of correlative rights, the latter is secondary and must yield to a reasonable exercise of the former. * * * "

*Denver Producing & Refining Company v. State,* 199 Okla. 171, 184 P.2d 961, 964 (1947).

In Gilmore, we quoted with approval from the above cases. We then said:

> "There is no indication that a more equitable formula could be devised * * *. The operator's technical committee and the Commission, both having experience and expertise at unitization, settled the formula 67 as the fairest and most feasible * * *. It would appear, therefore, that there is little chance that anyone

involved could devise a better formula, nor is it likely that a different formula could receive the necessary approval.

\*　\*　\*　\*　\*　\*

"A reversal here would not give appellant a larger share of the allocation, but would send the case back to the Commission with a mandate to come up with another formula. We do not believe that even appellant has any real expectation of a different formula that would receive the required approval. If a new formula were found and agreed upon, it could spawn new lawsuits. The specter of veto by the United States Geological Survey would not disappear. It is a fact of life which we cannot ignore.

\*　\*　\*　\*　\*　\*

"Appellant seems to expect perfection. Justice was accomplished here as much as could be under the circumstances. \* \* \*" 642 P.2d at 780–781.

What was said in the Gilmore case is applicable to this case. It would be virtually impossible to devise a formula acceptable to all concerned.

Appellant argues that the Commission's order was not in accordance with law because it approved the formula under threat of nonproduction. Appellant contends that the evidence shows the formula was forced upon the parties by Mitchell. Appellant also argues that the Commission's order was in error because it approved a seven thousand acre unit, and Mitchell was only planning a pilot project.

■ The testimony relied upon by appellant does not indicate that the Commission was threatened or blackmailed. Rather it shows that the other operators had worked over a long period of time in coming to a common agreement as to which formula should be adopted. Mitchell informed the Commission that they did not believe they could get the requisite approval for using a different formula. Appellant characterizes this statement to be a threat. However, it appears merely a realistic appraisal of the negotiations and the work that had already been done and the fact that a majority of

the operators would not agree to a different formula. Appellant does not substantiate his allegations of blackmail with competent evidence showing either a threat or Commission's acquiescence to any improper demands, nor does he cite persuasive authority. We are not required to consider questions which are not supported by proper citation of authority or cogent argument. *Osborne v. Manning*, Wyo., 685 P.2d 1121 (1984).

There was no reason for the Commission to approve a unitization agreement merely because the parties indicated that a different agreement would not be acceptable. The Commission had the authority to order shut-in production pending successful negotiations if it believed the allocation formula did not protect correlative rights or otherwise meet statutory criteria. § 30–5–117, W.S.1977. *Inexco Oil Company v. Oil and Gas Conservation Commission*, Wyo., 490 P.2d 1065 (1971). The Commission exercised its authority and shut-in production in the Hartzog Draw area, which was the subject of the Gilmore case.

■ Appellant's complaint about the Commission approving a 7,000 acre unit also lacks cogent argument and authority. Furthermore, appellant did not make this complaint to the Commission. Issues which were not raised before the administrative agency will not be considered for the first time on appeal. *McCulloch Gas Transmission Company v. Public Service Commission of Wyoming*, Wyo., 627 P.2d 173 (1981); and *Matter of State Bank Charter Application of Security Bank, Buffalo*, Wyo., 606 P.2d 296 (1980).

Appellant states in his argument that there is no evidence before the Commission concerning waste. Be it remembered that appellant effectively stipulated that waste would occur absent the unit agreement at the hearing. All parties were in agreement that unitization would prevent waste. We will not consider appellant's contention that there was no evidence of waste before the Commission. That was not an issue before

the Commission and cannot be considered for the first time on appeal.

## CONCLUSION

Before the Commission hearing, negotiation among interested parties demonstrated that all parties agreed that unitization was appropriate. The only problem was agreeing on a formula.

At the Commission hearing, a formula favored by appellant was considered, along with the formula proposed by Mitchell. The formula favored by appellant received only a small percentage vote, while the Mitchell formula received the necessary vote to legally form the unit. At the hearing, correlative rights was the principal matter considered. The Commission determined that the formula prepared by Mitchell was fair and equitable and that correlative rights were protected.

We must accord considerable deference to the Commission and its expertise. We cannot say that it was clearly wrong in its determination.

Affirmed.