856 P.2d 428 (1993)
WYOMING STATE TAX COMMISSION; and State Board of Equalization and its members Nancy Freudenthal, Marvin Applequist and Charles Brown, III, in their official capacities, Appellants (Defendants),
v.
BHP PETROLEUM COMPANY INC., and Monsanto Company, Appellees (Plaintiffs).
W.A. MONCRIEF, Jr., Appellant (Defendant),
v.
WYOMING TAX COMMISSION; and State Board of Equalization and its members Nancy Freudenthal, Marvin Applequist and Charles Brown, III, in their official capacities; Lorraine Ocenas, in her official capacity as the Assessor for Fremont County, Wyoming; Paula Merryman, in her official capacity as the Treasurer for Fremont County, Wyoming; Gary Shoemaker, Jane Adamson, Ralph Urbigkeit, Tom Satterfield and Clayton Hull in their official capacities as the County Commissioners of Fremont County, Wyoming, Appellees (Defendants).
BHP PETROLEUM COMPANY, INC.; Monsanto Company; North Central Oil Corporation; and Inexco Oil Company, Appellants (Plaintiffs/Defendant),
v.
WYOMING STATE TAX COMMISSION; State Board of Equalization and its members Nancy Freudenthal, Marvin Applequist, and Charles Brown, III, in their official capacities; Lorraine Ocenas in her official capacity as Assessor for Fremont County, Wyoming; Paula Merryman, in her official capacity as the Treasurer for Fremont County, Wyoming; Gary Shoemaker, Jane Adamson, Ralph Urbigkeit, Tom Satterfield and Clayton Hull in their official capacities as the County Commissioners of Fremont County, Wyoming, Appellees (Defendants).
Nos. 92-154 to 92-156.
Supreme Court of Wyoming.
June 23, 1993.
*430 Joseph B. Meyer, Atty. Gen. and Michael L. Hubbard, Sr. Asst. Atty. Gen., argued for State Tax Com'n and State Bd. of Equalization and its members.
R. Garth Ferrell of Parcel, Mauro, Hultin & Spaanstra, Denver, CO, Robert T. McCue and William J. Thomson, II of Dray, Madison & Thomson, Cheyenne, for BHP Petroleum, et al. Morris R. Massey, argued, of Brown & Drew, Casper, for W.A. Moncrief, Jr., Peter A. Bjork, argued, Gregory R. Danielson and Alan B. Cameron of Poulson, Odell & Peterson, Denver, CO; and David D. Uchner, Cheyenne, for Inexco Oil Co.
Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.
CARDINE, Justice.
This appeal involves issues relating to payment and collection of ad valorem taxes from the Madden Deep oil and gas unit. Both the State and taxpayers (appellants in appeals number 155 and 156 and appellees in appeal number 154), appeal a summary judgment entered by the district court. In the first appeal, the State contends that the district court incorrectly ruled that the State could not collect taxes from the unit operator when the taxes are owed by the working interest owners. In the second appeal, the taxpayers contend that Wyoming's omitted property statute, W.S. 39-2-403(c) (1990), prohibits the State from retroactively revaluing and reassessing production when the original value did not include ad valorem tax reimbursements. The district court held that the omitted property statute did not prohibit reassessment for ad valorem tax reimbursements. Taxpayers also contend that this court's decision in Enron Oil & Gas Co. v. Dep't of Revenue & Taxation, 820 P.2d 977 (Wyo.1991), should not be retroactively applied.
We affirm the district court's decision.

FACTS
The Madden Deep Unit (Unit) is a large federal oil and gas unit and includes leases in Fremont and Natrona Counties. BHP Petroleum Co., Inc. v. Wyoming Tax Comm'n, 766 P.2d 1162, 1163 (Wyo.1989). From 1975 until October 1990, BHP (formerly Monsanto Oil Company) was the unit operator of the Madden Deep Unit. During 1985, all of the stock of Monsanto Oil Company was sold and transferred to the parent company of BHP Petroleum Company, Inc. (BHP). BHP managed the entire unit for parties owning interests in production derived from Unit leases; BHP also owned a small percentage of the oil and gas produced from the Unit. BHP Petroleum, 766 P.2d at 1163. Currently the Unit is operated by the Louisiana Land and Exploration Company.
For each of the years from 1976 through 1987, the Wyoming State Board of Equalization (now the Department of Revenue) valued the production from the Madden Deep Unit and certified the valuation to the Fremont County Assessor. The valuations were entered upon the Fremont County assessment rolls, and ad valorem taxes were levied and then paid.
In the spring of 1988, the Department of Revenue audited the Madden Deep Unit and determined that the fair market value of the natural gas produced from the Unit for the years 1976 through 1987 was greater than the amount originally certified to the county assessor. The increased value resulted from reimbursements of ad valorem taxes that were made to certain working interest owners. As a result of the audit, the State Board of Equalization sent two Special Directives to the Fremont County Assessor which directed the assessor *431 to increase the value of the production from the Unit on the county's supplemental tax roll and issue ad valorem tax notices to BHP. The additional ad valorem tax notices for the years 1976 through 1987 issued to BHP showed the amount due as $1,092,082.01. A portion of that amount, $1,002,483.79, has been paid and placed in a protest account. There remains due $89,598.22.
In February of 1991, BHP and Monsanto brought an action against the State Tax Commission, the State Board of Equalization, the Fremont County Assessor and Treasurer as well as the Fremont County Commissioners. The suit also listed working interest owners in the Madden Deep Unit as defendants. Monsanto and BHP sought declaratory and injunctive relief.
The State and the Counties filed answers to the complaint. Inexco Oil Company and North Central Oil Corporation filed an answer and a cross-claim against the State and the County defendants. Their cross-claim alleged that the value information supplied to the county assessor by the Board of Equalization was incorrect and too high. They also requested that the State and County be enjoined from collecting additional ad valorem taxes for production for the years 1976 through 1987. W.A. Moncrief, Jr., filed an answer and also argued that the government defendants should be enjoined from collecting additional ad valorem taxes from the Unit. Tex/Con Oil & Gas Company, Chevron U.S.A. Inc., and Coastal Oil & Gas Corporation filed similar answers.
Later W.A. Moncrief, Jr., Inexco Oil Company and North Central Oil Corporation filed cross-claims against the government defendants. Their cross-claim alleged that the additional assessment of ad valorem taxes was illegal because there was no statutory authority to retroactively change values of personal property for prior years and because ad valorem tax reimbursements received by working interest owners were not a part of the fair cash market value. They also argued that a unit operator is not required to remit ad valorem taxes owed by the working interest owners. Later they filed a motion for summary judgment on their cross-claim.
Eventually Tex/Con Oil and Gas Company was dismissed from the action without prejudice. BHP and Monsanto, the plaintiffs, moved for summary judgment. They argued that, as a matter of law, the government defendants cannot assess additional ad valorem taxes for incorrect valuation that occurred in prior years. They also argued that the government defendants could not collect the taxes from the unit operator as the statute only allows for collection against the working interest owners. BHP and Monsanto also claimed that they were entitled to reimbursement from the working interest owners for their respective portions of the taxes, interest and penalties paid by BHP and Monsanto.
The district court, after hearing, issued a decision letter and an order. Inexco Oil Company, North Central Oil Corporation and W.A. Moncrief, Jr. (cross-claimants) and BHP Petroleum Company, Inc. and Monsanto Company (plaintiffs) filed a motion to amend the order. The district court entered a final amended order which granted partial summary judgment to the State and County defendants and partial summary judgment to plaintiffs. The State and County defendants and the unit operator and working interest owners appeal portions of the summary judgment entered by the court.
When this court reviews summary judgments, we have said that summary judgment is proper only when there are no genuine issues as to any material fact and the prevailing party is entitled to judgment as a matter of law. Sheridan Commercial Park, Inc. v. Briggs, 848 P.2d 811, 814 (Wyo.1993); see W.R.C.P. 56(c). In both of these appeals, the facts are not seriously disputed. Therefore we review the district court's determinations on questions of law. This court is not bound by the trial court's determinations on issues of law. True Oil Co. v. Sinclair Oil Corp., 771 P.2d 781, 789 (Wyo.1989). Using this standard of review, we consider separately the different issues raises by the different appellants.

*432 APPEAL NO. 92-154

The State of Wyoming raises this issue:
Under Wyoming law, may delinquent ad valorem taxes on mineral production be assessed and collected from the unit operator of a federal exploratory unit as opposed to the working interest owners?
The district court held that the unit operator, in that capacity, is not a "taxpayer" of ad valorem taxes on production under W.S. 39-3-101(d) or the operating agreements governing the unit. The State appeals that portion of the district court's ruling. We will examine the statute and the unit agreements in order to address the State's arguments.
Wyoming Statute 39-3-101(d) (1990) provides:
(d) In the case of the gross product of all mines and mining claims produced under lease, the lessor is liable for the payment of property taxes on the product removed only to the extent of the lessor's retained interest under the lease, whether royalty or otherwise, and the lessee or his assignee is liable for all other property taxes due on production under the lease.
All agree that the only way the unit operator can be liable under the statute is if the unit operator is found to be an assignee. The State emphasizes the "assignee" language in the statute claiming that the unit operator is an assignee because, under the unit agreements, he has stepped into the shoes of the individual working interest owners except that title has not been formally transferred to the unit operator. Because the unit operator has stepped into the shoes of the working interest owners, the argument goes, it is an assignee, and W.S. 39-3-101(d) holds assignees liable for property taxes due on production under the lease.
The district court held that:
Taxpayers have not, by way of the unit agreement, assigned their leases to the unit operator such that the unit operator is liable as taxpayer for ad valorem taxes. * * * No assignment has been made.
Under the operating agreement, the unit operator has paid the additional ad valorem taxes. However, this does not make the operator a taxpayer. Taxpayer status can only be created by legislation. See Wyo.Const.Art 15 § 13; Rocky Mountain Oil and Gas Assoc. v. State Board of Equalization, 749 P.2d 221, 240 (Wyo.1987) wherein the court stated: "The power to tax is a legislative power. The power to tax includes the power to say what shall be taxed, who shall pay it and what the tax shall be. (Citations omitted.)"
Thus, the district court concluded that no assignment existed between the unit operator and the working interest owners.
We agree with the district court's determination. We have examined the provisions of the unit agreements relied upon by the State in its brief. None of these provisions accomplish an assignment. Instead the relationship is more properly termed an agency relationship. Although prospecting and producing rights are delegated to the unit operator, no property rights have been assigned to the unit operator. The Madden Deep Unit Agreement specifically notes in the section defining the rights and obligations of the unit operator:
Nothing herein, however, shall be construed to transfer title to any land or to any lease or operating agreement * * *.
Since ad valorem taxes are assessed on property, e.g., the valuable production, and title to the property is not transferred, the unit operator is not the assignee of the property and, therefore, is not liable for the tax payment. Neither the original Unit Operating Agreement nor the Supplemental Operating Agreement accomplish an assignment of the owner's economic interest in the lease to the unit operator. The State argues that a profit a prendre, the right to search for valuable minerals, can be assigned. While that is generally true, the unit agreements clearly demonstrate that such assignment did not accomplish a transfer of ownership of production.
Section 39-3-101(d) provides that the leasee is responsible for payment of the tax on production. Since nothing in the *433 operating agreements makes the unit operator a lessee, or owner of the lease by virtue of assignment or any other arrangement, the unit operator is not responsible for payment of ad valorem taxes under W.S. 39-3-101(d). The Supplemental Unit Operating Agreement echoes this ownership-based notion of the tax liability:
All other taxes paid by Unit Operator shall be charged to and borne by the Parties in proportion to their ownership in the Committed Working Interests or Unitized Substances (as the case may be) upon which or in respect of which such taxes are paid.
Supplemental Unit Operating Agreement, Article 19.2. See also Unit Operating Agreement, Article 21.2.
The State next claims that unitization allows all those having a legal interest in an oil and gas field to join together in a common plan to gain effective production. See Trout v. Wyoming Oil & Gas Conservation Comm'n, 721 P.2d 1047, 1051 (Wyo. 1986) (quoting Parken v. State Corp. Comm'n, 234 Kan. 994, 677 P.2d 991, 1002 (1984)). In Trout this court was defining the relationship of parties who enter into a unitization plan in a general sense. Trout, 721 P.2d at 1051. We did not define what legal interest a unit operator in a unitization agreement possesses. Id. The State claims that when unitization occurs, the unit operator becomes the designated lessee of the unit by assignment of rights from the other interest owners. While that arrangement may be possible, the specific agreements of this unit do not bear out that relationship.
Ad valorem taxes are taxes on production. Union Pacific Resources Co. v. State, 839 P.2d 356, 361 (Wyo.1992). The unit agreements do not provide production ownership for any unit operator; rather, the agreements provide the unit operator with rights related to producing oil and gas. The delegation in the unit agreements here is much more limited than the State indicates. The delegation here is analogous to a corporation delegating to an officer the authority to receive tax notices and taxes from different corporate divisions and remit them to the tax assessor. This delegation of administrative duty does not cause the officer to be personally liable for the taxes and his personal assets levied against and sold.
The State next argues that our holding in BHP Petroleum Co., Inc. v. State, 784 P.2d 621 (Wyo.1989), controls the outcome of this issue. The State contends that this case is merely the ad valorem tax counterpart to the severance tax question we addressed in BHP v. State. In BHP v. State, we held that the unit operator was the "person extracting" within the meaning of severance tax section 39-6-307(e), and therefore the unit operator could be assessed the delinquent severance tax. BHP v. State, 784 P.2d at 625. Thus, it is said that ad valorem taxes should be assessed and paid in the same fashion as severance taxes and that the legislature did not intend for the collection of ad valorem taxes to be more burdensome than the collection of severance taxes. The State asserts finally that it has been assessing ad valorem taxes to the unit operator even longer than it has been assessing severance taxes to the unit operator, citing Miller v. Buck Creek Oil Co., 38 Wyo. 505, 269 P. 43 (1928).
Our holding in BHP v. State does not apply to the situation we address here. The statute we were required to interpret in BHP v. State is very different from the statute at issue here. The statute we examined in BHP v. State was W.S. 39-6-307(e) (1990):
Any person extracting valuable products subject to this article, and any person owning an interest in the valuable products to the extent of their interest ownership are liable for the payment of the taxes imposed by this article together with any penalties and interest.
See BHP v. State, 784 P.2d at 622. This statute expressly refers to the person extracting (unit operator) in the first clause and distinguishes the unit operator from the working interest owners mentioned in the next clause. No counterpart to this severance tax statute exists in the ad valorem tax statutes. The statute we examine *434 here only refers to "lessees or assignees" and does not mention a person who is physically extracting the valuable mineral product. W.S. 39-3-101(d).
The authority to create a taxpayer belongs exclusively to the legislature, and we cannot expand taxpayer status. See Wyo.Const.Art. 15 § 13; Rocky Mountain Oil & Gas Ass'n. v. State Bd. of Equalization, 749 P.2d 221, 240 (Wyo. 1987). Here the statute is clear that the unit operator does not have ownership or taxpayer status. The statutory language that required the holding we reached in BHP v. State is not found in the ad valorem tax statutes. The rationale of BHP v. State was that severance taxes were for the privilege of extracting minerals. That same rationale cannot be applied in the ad valorem tax context because of the different nature of the taxes. In Wyoming, the severance tax
is an excise tax upon the current and continuing privilege of extracting minerals. "The tax is not levied upon the preceding year's production, and that production is not called upon to bear the burden of the tax. The tax is not an ad valorem tax. The statute is very plain in stating that it is an excise tax laid upon the present and continuing privilege of extracting minerals."
BHP v. State, 784 P.2d at 626 (quoting, in part, Belco Petroleum Corp. v. State Bd. of Equalization, 587 P.2d 204, 210 (Wyo. 1978)). See Union Pacific Resources, 839 P.2d at 361. With a severance tax, the important question for tax liability purposes is the extraction of valuable mineral.
An ad valorem tax is a property tax which taxes the value of the mineral produced. Ownership is the important question for ad valorem tax liability purposes. See e.g., W.S. 39-3-101(c) & (d) (1990) and 39-3-102(d) (1990); Union Pacific Resources, 839 P.2d at 361; Board of Comm'rs v. Bernardin, 74 F.2d 809 (10th Cir.1934) (minerals when severed from realty become personalty; gross product tax is a tax on personal property). As we have noted, the ownership arrangement under this unitization agreement does not conglomerate ownership. "Right, title and interest to the mineral estate is not conglomerated, but rather each working interest owner retains ownership in the proportionate share and is entitled to make arrangements for sale of the product in any fashion desired." BHP v. State, 784 P.2d at 623.
The State next contends that the administrative practice of assessing the ad valorem taxes against the unit operator should guide this court in construing the statute. While we may look to an existing administrative interpretation of a statute as we did in BHP v. State, we do so only if the statute is ambiguous. The statute and the term "assignee" within the statute do not create an ambiguity that would necessitate application of a rule of construction. This statute is plain and unambiguous, and we give the words their plain and ordinary meaning without resorting to rules of construction. Vandehei Developers v. Public Service Comm'n, 790 P.2d 1282, 1285 (Wyo.1990).
The State contends that not accepting its interpretation of assignee, so as to allow collecting of ad valorem taxes from the unit operator, will make it difficult to collect these taxes. It is said that difficulty will result because the unit operator is responsible for reporting the volume of production and if then each working interest owner is to report their individual volume and the State must assess them pro rata, it will be an administrative nightmare. This might be possible if our holding were different. We limit the County and State's ability to collect taxes through sale of property, not their ability to assess taxes. We think the hypothetical difficulty is not borne out. Appellees point out in their brief:
Appellees do not seek to impose an administrative nightmare on the taxing authorities. The operator will continue to provide assessment data. Tax notices may be sent to the operator, as in the past. The operator will continue to discharge its contractual duty to pay taxes on behalf of other owners (subject, of course, to adequate provisions for reimbursement *435 by them). The operator and other owners who have paid their taxes should not, however, have their property placed in jeopardy because of the failure of a delinquent owner to pay the taxes on production owned and sold by that owner.
We conclude that W.S. 39-3-101(d) was intended to relieve a mineral owner lessor from a tax lien that arises when the lessee of the land has failed to pay the ad valorem taxes on the production from the land. The language of the statute protects lessors of mineral production land from tax liens when their lessees do not properly pay the taxes assessed to the lessees. The statute does not create a new category of taxpayers.
Thus, we hold that this unit operating agreement is not an assignment but instead a contract of agency, and the unit operator is the agent of the working interest owners for limited and specified purposes; that while the State may send the unit operator notice of the tax assessment and the unit operator may continue to pay taxes for other owners voluntarily or pursuant to contract, the State may not collect taxes due from others by forcing payment by the unit operator.

APPEALS NO. 92-155 & 156
Appellants BHP and Monsanto raise these issues for our consideration:
(1) Whether an assessment of ad valorem taxes, once certified to the assessor, can be retroactively modified.
(2) Whether there exists statutory authority to allow the revaluation of previously taxed property (i.e., natural gas production) and the retroactive reassessment, levy and collection of additional ad valorem tax on such property and, if so, whether the authority of the government appellees to retroactively reassess such property for ad valorem tax purposes is limited by the provisions of W.S. § 39-2-403(c).
Appellees ask:
Is there any applicable limitation upon the Board of Equalization's authority to examine cases wherein property subject to taxation has been improperly and unequally assessed and thereafter remedy such improper administration of the tax laws?
Should this court address the issue regarding the retroactive application of Enron Oil and Gas Company v. Department of Revenue and Taxation, when such issue was never presented nor raised in the district court?
As stated earlier, the State conducted an audit which revealed that the taxes appellants had originally paid did not reflect an accurate valuation of the Unit's production. The district court found that the State has authority to reopen prior certifications and assess additional ad valorem taxes. Appellants claim that there is no statutory authority for retroactive reassessment of ad valorem taxes.
As support for its ability to make the retroactive ad valorem assessments, the State cites W.S. 39-1-304(a)(xiv) (Cum. Supp.1992), which states:
(a) The state board of equalization shall perform the duties specified in article 15, section 10 of the Wyoming constitution and shall hear appeals from county boards of equalization, review final decisions of the department on state excise taxes and review department assessments of property and tax determinations. In addition, the board shall:
* * * * * *
(xiv) Carefully examine into all cases wherein it is alleged that property subject to taxation has not been assessed or has been fraudulently, improperly, or unequally assessed, or the law in any manner evaded or violated, and cause to be instituted proceedings which will remedy improper or negligent administration of the tax laws of the state[.]
Appellants contend that this section does not contain legislative authority for retroactive assessment. We disagree. This section provides for revaluation when it directs the State Board of Equalization to discover errors or unequally assessed taxes *436 and remedy those errors. W.S. 39-1-304(a)(xiv). As the State points out, errors are usually discovered by looking back, therefore retroactive action is explicit in the statute. Thus the process that occurs is prospective correction of improper self-assessment. It is not retroactive revaluation. This court has held that statutes must be interpreted in a fashion which permits an agency to carry out its legislative mandate. Amoco Production Co. v. State Bd. of Equalization, 797 P.2d 552, 554-55 (Wyo.1990) (citing Pathfinder Mines Corp. v. State Bd. of Equalization, 766 P.2d 531, 536-37 (Wyo.1988)). We therefore, hold that W.S. 39-1-304(a)(xiv) specifically authorizes the Board to remedy improper assessments.
We are cognizant of appellant's argument that tax legislation must be construed prospectively. Belco Petroleum Corp. v. State Bd. of Equalization, 587 P.2d 204, 210 (Wyo.1978). This statute, however, expresses clear direction that the Board must remedy past assessment errors which necessarily requires retrospective action. Still appellants maintain that the Board cannot retroactively reassess. For support, appellants point to W.S. 39-2-403(c), the omitted property statute, and argue that the omitted property statute limits the Board's authority to retroactively reassess ad valorem taxes. Section 39-2-403(c) (1990) provides:
(a) On or before the first Monday of August, the board of county commissioners shall by order entered of record levy the requisite taxes for the year. On or before the third Monday in August the county assessor shall compute the taxes from the corrected valuations as corrected by the state board and entered by the county assessor in the column of corrected valuations. The county assessor shall deliver the tax list and his warrant for the collection of the taxes to the county treasurer * * *.
* * * * * *
(c) The county assessor may authorize changes in the assessment roll or tax list at any time to correct errors in the name of a person taxed or to enter omitted property and its assessed value. Property omitted from prior year tax lists discovered by the county assessor shall be added to the assessment roll and taxes computed and collected for the period the property was omitted not exceeding five (5) prior years or since the last change in ownership, whichever is less.
Appellants argue that the statute only allows revaluation if the property was altogether omitted from the tax rolls and that the State's ability to revaluate is limited because of the need for finality in tax assessments. An ad valorem tax is a tax upon particular real or personal property. If reassessment is allowed, the argument goes, then there is confusion concerning the title to the property when the property has been transferred on the basis that the taxes have already been paid.
In addressing the innocent purchasers' argument appellants raise, the district court specifically found that "[t]here is no evidence that any of the parties fall within the hypothetical case involving an innocent purchaser." The district court also found that tax liens under W.S. 39-3-102(a) do not extend to past deficiencies which arise because of reassessment. Therefore, innocent purchasers are not harmed. We need not address the applicability of tax liens to reassessments because the question is not before us. We note, however, that the district court's alternative basis for its decision is persuasive.
The omitted property statute simply does not apply to assessments which originate from the Board of Equalization. In Title 39 of the Wyoming Statutes, the legislature has provided for both state-assessed and county-assessed property. See W.S. 39, chap. 2, articles 2 & 3 (1990). Article 2 of the Assessment Chapter covers state assessments, and Article 3 covers county assessments. Id. With mineral assessments, the Board is required to calculate and set the assessment. W.S. 39-2-201(e) (Cum.Supp.1992). With other types of property, the task of calculating and setting the assessment belongs to the county assessor. Under the mineral assessment procedure, although the County does enter the assessment on the tax rolls, *437 the certification of the assessment is done by the State. The omitted property statute, which limits the ability to reassess to five years, must be interpreted along with W.S. 39-1-304(a)(xiv), which does not contain a limitation on the State's ability to reassess. The legislature in § 39-1-304(a)(xiv) gave the Board unlimited authority to examine all cases where it is alleged that property has not been assessed. The district court resolved the tension between the statutes as follows:
To resolve this aspect of the dispute the court has reviewed the legislation in its entirety and notes a legislative intent to treat "omitted property" in different ways. In W.S. § 39-1-304(a)(xiv), the legislature granted to the Board of Equalization the power to deal with property which had not been assessed. It granted to the Board, without any time limitation, the right to remedy the problem. In contrast, W.S. § 39-2-403(c) deals with the very same problem, and it uses the term "omitted property." However, it imposes a five year period of limitation to remedy the problem. * * * Limiting W.S. § 39-2-403(c) to county originated assessments removes the discrepancy. Hence, the legislation itself compels the conclusion that W.S. 39-2-403(c) does not extend to state originated assessments.
We agree with the district court's analysis. The omitted property statute does not limit the Board's power under § 39-1-304(a)(xiv) to reassess property that was undervalued.
Appellants argue that we should construe Wyoming's omitted property statute in the same fashion as the Colorado Court of Appeals did in Cabot Petroleum Corp. v. Yuma County Bd. of Equalization, 847 P.2d 152 (Colo.App.1992) cert. granted 2/22/93. In Cabot, the court of appeals ruled that Colorado's omitted property statute allows retroactive assessment on omitted property but not on omitted value. Cabot, 847 P.2d at 155. We decline to follow the Cabot decision. In Cabot, the State relied on the omitted property statute as its authority for retroactive reassessment. In Wyoming, unlike in Cabot, the legislature has given express authority for the Board of Equalization to reassess undervalued property under W.S. 39-1-304(a)(xiv). Cabot is thus distinguishable. We therefore hold that the omitted property statute does not limit the State's power under W.S. 39-1-304(a)(xiv) to reassess property that was undervalued.

Retroactive Application of Enron
The State next contends that we should not consider whether our decision in Enron Oil & Gas Co. v. Dep't of Revenue & Taxation, 820 P.2d 977 (Wyo.1991), should be applied retroactively because this issue was not raised in the district court. The district court's order stated:
[T]he issue regarding the taxability of ad valorem tax reimbursements was not pursued and is dismissed in accordance with Enron Oil & Gas Company v. Department of Revenue & Taxation, 820 P.2d 977 (Wyo.1991)[.]
According to the State, the plaintiffs in this action never raised the retroactivity issue. The State argues that this court should not consider the retroactivity of Enron because the court does not consider matters raised for the first time on appeal, nor can parties advance new theories which are not apparent or readily discernible from the pleadings. Minnehoma Financial Co. v. Pauli, 565 P.2d 835, 838 (Wyo.1977).
Throughout the litigation, appellants continued to argue that the State could not retroactively revalue production. Our decision in Enron authorized the State to include ad valorem tax reimbursements as a component of value, and appellants' argument questioned the retroactive affect of Enron. After a review of the record, and the portions that appellants refer to us, we conclude that the retroactivity issue was raised below and that it is reasonably discernible from the pleadings.
Even were we to conclude that the retroactivity issue were not raised adequately below, we would still address that issue. This court will consider issues not raised below when the issues are jurisdictional, or of such a fundamental nature that the court must take cognizance of *438 them. Scherling v. Kilgore, 599 P.2d 1352, 1358 (Wyo.1979). See also Oatts v. Jorgenson, 821 P.2d 108, 111 (Wyo.1991); White v. Fisher, 689 P.2d 102, 105 (Wyo. 1984). Thus, we address the issue of whether this court's decision in Enron should be applied retroactively.
Appellants contend that the court's ruling in Enron was not anticipated by the industry. In addition, Enron was announced while this case was pending in the lower court and was a question of first impression. Since Enron was the first time the court had held that the Department of Revenue and Taxation can include ad valorem tax reimbursements as a component in the assessment process for determining fair cash market value of minerals including natural gas, appellants argue that it should be applied prospectively only.
Both sides agree that the method this court should use to determine the retroactivity question is the test for retroactivity set out by the United States Supreme Court in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). We have utilized the Chevron analysis in other cases. Hanesworth v. Johnke, 783 P.2d 173, 177 (Wyo.1989); Adkins v. Sky Blue, Inc., 701 P.2d 549, 552 (Wyo.1985); Witzenburger v. State ex rel. Wyoming Community Dev. Auth., 577 P.2d 1386, 1387 (Wyo.1978). Chevron is also the current test used by other courts. See e.g., Martin Marietta Corp. v. Lorenz, 823 P.2d 100, 111-12 (Colo.1992). Under Chevron, we must consider three factors:
First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed[.] Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the `injustice or hardship' by a holding of nonretroactivity."
Chevron, 404 U.S. at 106-07, 92 S.Ct. at 355 (citations omitted).
Appellants argue that Enron was a decision of first impression. While appellants are correct that this court had not previously ruled the way it did in Enron, it was not a case of first impression with respect to that portion of the Chevron test. Under Chevron, the case must establish a new principle of law. Chevron, 404 U.S. at 106, 92 S.Ct. at 355. It can do so by either overruling clear past precedent or deciding an issue of first impression "whose resolution was not clearly foreshadowed." Id. Enron did not overrule past precedent. Enron, 820 P.2d at 982. See also Witzenburger, 577 P.2d at 1387-88. But the resolution of the question announced by the court in Enron was clearly foreshadowed by past practice and fair and reasonable statutory construction. Enron, 820 P.2d at 980, 982. The State indicates that fair cash market value for ad valorem tax purposes has always included ad valorem tax reimbursements, and many producers reported and paid their tax on ad valorem tax reimbursements before Enron.
Under the second prong of Chevron we must balance the advantages and disadvantages in each case and examine the purpose and effect of the rule in Enron and decide whether retrospective application will further or retard its operation. Chevron, 404 U.S. at 106-07, 92 S.Ct. at 355. It is said that the hardships that will be created by retroactive application of Enron outweigh the benefits to the rule and that taxpayers will be exposed to millions of dollars in retroactive assessments when they already face an uncertain and volatile market. There are important principles of equity and uniformity, however, that will be circumvented if the rule articulated in Enron is not applied retrospectively. Under the Wyoming Constitution, minerals are a class of property and, as such, they must be uniformly given full value. Wyo.Const. *439 Art. 15 § 11(a) & (d). See also Union Pacific Resources, 839 P.2d at 370. Thus, limiting Enron to prospective application would have the effect of taxing mineral producers who reported reimbursements as part of value at a higher rate than those who failed to report. Those who fail to report reimbursements would gain a substantial benefit over those who did report.
Under the third prong of Chevron, if substantial inequitable results would occur by retroactive application of the rule, then the rule should be held not retroactive. Chevron, 404 U.S. at 107, 92 S.Ct. at 355. Appellants argue that hardship might indeed result by retroactive application of Enron if property rights would be disturbed. They also state that they paid taxes and should be protected from having to pay additional taxes on previously taxed property.
We agree that hardship will result to these appellants. However, that hardship is outweighed by the benefits that come from the rule we established in Enron. The necessity for equal and uniform taxation is compelling and overriding. In general, "statutes operate prospectively, while judicial decisions are applied retroactively." Martin Marietta, 823 P.2d at 111 (citing United States v. Sec. Indus. Bank, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982)). Therefore, our decisions are applied retroactively unless the factors under the Chevron test demonstrate that a decision should have prospective effect only. After considering each of these factors, we conclude that Enron should be applied retroactively.
Appellants also argue that the district court's construction of the omitted property statute is a construction of first impression and should be applied prospectively only. Appellants cite no case in which this court has held that the district court's decision does not apply to nor affect the parties to the case, but only affects future cases. Thus, we conclude that this argument, although novel, is without merit. As discussed above, the district court's construction of the two statutes was the correct construction under the clear statutory language.
In their last argument, appellants claim that the district court's decision constitutes impermissible judicial legislation in the area of taxation. Appellants are certainly correct that the enactment of tax measures is exclusively within the providence of the legislature. Wyo.Const.Art. 3 § 35. See e.g., Board of Equalization v. Jackson Hole Ski Corp., 737 P.2d 350, 356 (Wyo.1987). However, contrary to appellants' contention, the district court did not enact additional taxes or additional state powers, rather it merely applied statutes the legislature had enacted. It was the legislature that gave the State the power in the statute. The district court merely construed and applied the statute and, therefore, acted well within its constitutional scope. See also Davidson v. Sherman, 848 P.2d 1341, 1348-49 (Wyo.1993).

CONCLUSION
We hold that the unit operator is not the "taxpayer" of ad valorem taxes on production under either W.S. 39-3-101(d) or the Unit Operating Agreement. We hold, therefore, that each working interest owner is liable for the increased ad valorem taxes due to the increased value of production by virtue of the ad valorem tax reimbursements.
We also hold that the omitted property statute, W.S. 39-2-403(c) does not preclude the State from the revaluation and reassessment of ad valorem taxes in this case. We hold that the State is both allowed and required to make such reassessments under W.S. 39-1-304(a)(xiv). Finally, we hold that our decision in Enron is to be applied retroactively.
The decision of the district court is, therefore, affirmed.