**F I L E D**

**UNITED STATES COURT OF APPEALS**

**NOV 3 2004**

**TENTH CIRCUIT**

SAMSON RESOURCES COMPANY,
an Oklahoma corporation,

      Plaintiff - Appellee,

v.

ABRAXAS WAMSUTTER LP, an
Oklahoma corporation; ABRAXAS
PETROLEUM CORPORATION, a
Nevada corporation,,

      Defendants - Appellants.

No. 02-8019
(D. Wyoming)
(D.Ct. No. 01-CV-58-B)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **O'BRIEN**, Circuit Judges, and **EAGAN**, District Judge.[**]

    In this diversity action, Abraxas Wamsutter, L.P., and Abraxas Petroleum

Corporation (collectively "Abraxas") appeal the district court's denial of their

motion for summary judgment and its award, instead, of summary judgment to

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Claire V. Eagan, United States District Judge for the Northern District of Oklahoma, sitting by designation.

Samson Resources Company ("Samson"). *See* 28 U.S.C. § 1332. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Pursuant to a Purchase and Sale Agreement ("Agreement"), on January 1, 2000, Abraxas sold oil and gas properties and related assets[1] ("Interests") located in Sweetwater and Carbon counties, Wyoming, to Samson. Article 1.3(i) of the Agreement provides: "Seller will own all merchantable oil, gas, condensate and distillate ("Hydrocarbons") produced from the Interests before [January 1, 2000]." (R. Appellant App. Vol. I at 29.) Article 1.4 states: "Buyer will own all Hydrocarbons produced from the Interests on and after [January 1, 2000]." (*Id.*) There is no dispute Abraxas owned and profited from oil and gas production on the properties until January 1, 2000.

The Agreement addresses the responsibility of the parties to pay taxes. In particular, Article 10.2 provides: "Ad Valorem, Real Property and Personal Property Taxes. All Ad Valorem Taxes, Real Property Taxes, Personal Property Taxes, and similar obligations ("Property Taxes") on the Interests are Seller's obligation *for periods before* [January 1, 2000] and Buyer's obligation *for periods*

---

[1]The related assets consist of surface estate, surface improvements and personal property incident to the drilling process (not including produced minerals). Samson does not dispute it is liable for payment of the ad valorem taxes assessed in 2000 on these assets pursuant to Article 10.2 of the Agreement.

*on and after* [January 1, 2000]." (*Id.* at 59) (emphasis added). Article 10.3

provides: "<u>Severance Taxes</u>. Seller shall bear and pay all severance *or other*

*taxes measured by Hydrocarbon production from the Interests, . . .* to the extent

attributable to production from the Interests before [January 1, 2000]." (*Id.*)

(emphasis added).

The oil and gas properties produced minerals in 1999. In October 2000,

Carbon and Sweetwater counties sent Abraxas a notice of total tax due for ad

valorem taxes assessed in 2000 but calculated against 1999 production.[2] Abraxas

refused to pay the taxes.[3] Samson paid the first half of the taxes plus interest

($572,647.60);[4] neither party paid the second half ($540,422.23 [not including

---

[2]"Annually, on or before October 10 the county treasurer shall send a written statement . . . of total tax due, itemized as to property description, assessed value and mill levies, to each taxpayer at his last known address." WYO. STAT. ANN. § 39-13-107(b)(i)(C) (1977).

[3]Wyoming statute provides:

Taxes provided by this act are due and payable at the office of the county treasurer of the county in which the taxes are levied. Fifty percent (50%) of the taxes are due on and after September 1 and payable on and after November 10 in each year and the remaining fifty percent (50%) of the taxes are due on and after March 1 and payable on and after May 10 of the succeeding calendar year except as hereafter provided. If the entire tax is paid on or before December 31, no interest or penalty is chargeable [.]

WYO. STAT. ANN. § 39-13-107(b)(i)(D) (1977).

[4]Samson paid the first half of the taxes in order to staunch interest accumulation. In doing so, it relied on language in Article 10.3 of the Agreement: "If either Party pays taxes owed by the other, upon receipt of evidence of payment the nonpaying party will

interest and penalty]). Samson filed suit claiming, *inter alia*, breach of contract based on Abraxas' failure to reimburse Samson for the first half of the taxes paid. It also sought a declaratory judgment that Abraxas was responsible under the Agreement and Wyoming law for payment of the ad valorem taxes assessed in 2000 because they were based on 1999 production.[5] Abraxas defended on the basis the ad valorem taxes in question were assessed in 2000, and therefore, under the Agreement and Wyoming law, Samson was responsible for their payment.

On cross-motions for summary judgment, the district court found there was no genuine issue of material fact and awarded judgment in favor of Samson. It ordered Abraxas to reimburse Samson the $572,674.60 it paid in ad valorem taxes and interest to Carbon and Sweetwater counties, together with statutory interest from the date of payment; it further found Abraxas liable for the unpaid second half of ad valorem taxes in the amount of $540,422.23, plus interest and penalty. Abraxas appeals from this order.

**STANDARD OF REVIEW**

Summary judgment is required where the record shows "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We review summary judgment de

reimburse the paying Party promptly for its proportionate share of such taxes." (R. Appellant App. Vol. I at 59-60.)

[5]Samson alleged two additional claims not material to resolution of this appeal.

novo. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000). "If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court." *Wolf v. Prudential Ins. Co. of Am.* , 50 F.3d 793, 796 (10th Cir. 1995).

In a diversity action, we apply the substantive law of the forum state, including its choice of law rules.[6] *Moore v. Subaru of Am.,* 891 F.2d 1445, 1448 (10th Cir. 1989). Therefore, we apply Wyoming law. In doing so, "[w]e may take judicial notice of agency regulations." *Town of Pine Bluffs v. State Bd. of Control, Wyo.,* 647 P.2d 1365, 1367 (Wyo. 1982). "[C]ontemporaneous construction of a statute by the administrative authorities must be given weight in interpreting a statute, unless the construction is clearly erroneous." *Id.*

In construing a contract,

> when the terms of the agreement are unambiguous, the interpretation is a question of law, and a summary judgment is appropriate because there is no genuine issue of material fact. Whether a contract is ambiguous is a question of law for the reviewing court. We review questions of law *de novo* without affording deference to the decision

---

[6]Although Article 12.15 of the Agreement required Texas law be applied, in the district court Abraxas relied on Wyoming law to advance its arguments and expressly acknowledged Wyoming law applied to resolution of the case. The district court applied Wyoming law. To the extent Abraxas argues for the first time on appeal that Texas law should control, we dismiss this contention for two reasons. First, having failed to invoke the choice of law provision in the district court, Abraxas effectively waived its right to rely on Texas law. *See Air Liquide Am., Corp. v. Continental Cas. Co.,* 217 F.3d 1272, 1275 n.2 (10th Cir. 2000). Second, Abraxas fails to demonstrate Wyoming and Texas follow materially different principles of contract interpretation.

of the district court.

> According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the four corners of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate.

*Amoco Prod. Co. v. EM Nominee P'ship Co.,* 2 P.3d 534, 540 (Wyo. 2000)

(quotation and citations omitted).

> When the agreement's language is clear and unambiguous, we consider the writing as a whole, taking into account relationships between various parts. In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract.

*Boley v. Greenough,* 22 P.3d 854, 858 (Wyo. 2001) (citation omitted). "It is well-settled that a contract is not ambiguous simply because the parties urge varying interpretations." *In re Estate of Corpening,* 19 P.3d 514, 517 (Wyo. 2001). "Common sense and good faith are leading precepts of contract construction." *Polo Ranch Co. v. City of Cheyenne,* 969 P.2d 132, 136 (Wyo. 1998).

## DISCUSSION

Samson contends the 2000 ad valorem tax calculated on the basis of 1999 production is a tax due on 1999 production and is thus, under Wyoming law and

the Agreement, Abraxas' responsibility.  Abraxas contends the tax is against the 2000 unproduced mineral estate (merely measured by 1999 production) and is thus Samson's responsibility under both the law and the Agreement.[7]  To identify the appropriate taxpayer, we look first to the Wyoming statutory scheme, together with its antecedent constitutional provision, implementing regulations and interpretive caselaw.  Second, we examine whether the parties contractually agreed to shift the taxpayer responsibility imposed by Wyoming law and, if so, to what effect.

### Wyoming Statutory Scheme

The Wyoming Constitution provides:

> All mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, mineral oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, *on the gross product thereof, as may be prescribed by law*; provided, that the product of all mines shall be taxed in proportion to the value thereof.

WYO. CONST. art. 15, § 3 (emphasis added).[8]

---

[7] Specifically, Abraxas argues "the ad valorem tax is [annually] levied . . .upon the unproduced mineral estate and the fair market value of that estate is deemed to be the value of oil and gas produced in the prior year." (Appellant's Br. at 7.)  "[T]he ad valorem tax is levied on the year 2000 mineral estate, not the 1999 production.  Samson owns . . . the year 2000 mineral estate . . . .  As a result, . . . Samson owes the year 2000 ad valorem tax on that property." (*Id.*)

[8]There was extended debate during the constitutional convention over whether to tax the mineral estate or the gross product thereof.  Delegate Brown, a leading opponent of taxing the mineral estate, declaimed:

The parties do not dispute the gross product tax authorized by the constitution is an ad valorem tax.[9] "The ad valorem (gross products) tax relates to the ownership or interest in the mineral removed, extracted, severed or produced, . . . ." Wyo. Dep't of Revenue Rules & Regulations, Ch. 6 § 5(a)(i). *"Liability for ad valorem (gross products) . . . taxes arises when any mineral is removed, extracted, severed or produced in this State."* *Id.* Ch. 6 § 5(a) (emphasis added). "In accordance with the Wyoming Constitution and Statutes, the gross products tax shall be in lieu of ad valorem taxation of those lands and equipment, and shall be levied on all mineral interest owners in proportion to their ownership shares unless exempted by law." *Id.* Ch. 9 § 5. "All Ad Valorem taxes on the gross

---

You are satisfied to tax this property according to its value. When its value cannot be ascertained, when there is no man who can go below the surface and tell whether there are two thousand or ten thousand tons an acre, how are you to fix its value? How are you going to levy a tax upon the value of the land when you don't know what it is, and cannot ascertain? The only thing you can do is to do about what we are doing now, to tax it at some merely nominal value, and as long as you tax it at a merely nominal value, we get nothing for the support of our government out of the coal mines.

JOURNAL AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF WYOMING (The Daily Sun, Book and Job Printing, 1893) at 641. Delegate Hoyt added: "I have just a few words to say on this subject. In the first place if we are going to levy a tax, I insist it should be an ad valorem tax. If we are to tax the output of mines, let it be the output of all mines. Then let it be ad valorem, according to the value of the output, of whatever mine it may be." *Id.* at 691-92.

[9]An ad valorem tax is defined as a "tax imposed proportionally on the value of something (esp. real property), rather than on its quantity or some other measure." BLACK'S LAW DICTIONARY 1469 (7th ed. 1999). *See also* WYO. STAT. ANN. § 39-13-101(a)(i) ("'ad valorem' means according to value . . . .").

product from an oil or gas property . . . shall be remitted by the interest owner . . . ." *Id.* Ch. 6 § 6(a)(i).

The tax is determined as follows. The Department of Revenue ("Department") is required to "annually *value* and *assess*" at "fair market value" the "gross product of all mines and mining claims." WYO. STAT. ANN. § 39-13-102(m)(i) (emphasis added).[10] "The fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed." *Id.* § 39-14-203(b)(ii). "Ad Valorem taxes are determined from the gross production of minerals for the *previous* calendar year." Wyo. Dep't of Revenue Rules & Regulations, Ch. 6 § 5(a)(i) (emphasis added).

As the first step in the process of valuation, assessment, levy and collection of the ad valorem tax on production, on or before February 25 "of the year following the year of production," an oil or gas producer is required to report production to the Department.[11] WYO. STAT. ANN. § 39-14-207(a)(i). With this information in hand, the Department "shall annually *value* crude oil, lease condensate and natural gas for the preceding calendar year in appropriate unit

---

[10]Oil and gas product is assessed at 100 % of fair market value. *Id.* § 39-11-101(a)(xvii)(A).

[11]The record suggests Abraxas, as the producer, submitted the 1999 production report. Abraxas acknowledged as much by acquiescing to admission of Samson's Exhibit 1 at the district court's hearing on the cross-motions for summary judgment. The exhibit includes an entry indicating Abraxas filed the required annual report on 1999 production in February 2000. (R. Appellee Supplemental App. Vol., Tab 2.)

measures at the fair market value of the product . . . ." *Id.* § 39-14-202(a)(ii) (emphasis added). *See also id.* § 39-13-102(m) ("The department shall annually *value and assess* the following property at its fair market value for taxation: (i) The gross product of all mines and mining claims; . . . ." (emphasis added)). "Following determination of the fair market value of property the department shall notify the taxpayer by mail of the assessed value." *Id.* § 39-13-102(n).[12] "[O]n or before June 1, or as soon thereafter as the fair market value is determined, the department shall certify the valuation determined by the department to the county assessor of the county from which the crude oil, lease condensate or natural gas was produced to be entered upon the assessment rolls of the county[.]" *Id.* § 39-14-202(a)(iii).

"On or before the first Monday of August, the board of county commissioners shall by order entered of record *levy* the requisite taxes for the year,"[13] following which the assessor computes the taxes and "deliver[s] the tax list and his warrant for the *collection* of the taxes to the county treasurer . . . ." *Id.* § 39-13-102(g) (emphasis added). "The county treasurer upon receiving the tax list and warrant shall immediately proceed to collect the taxes levied for the current year and taxes remaining unpaid from preceding years." *Id.* § 39-13-

---

[12]On April 17, 2000, the Department advised Abraxas of the value it placed on its 1999 production.

[13]*See id.* § 39-13-104 (authorizing mill levy).

-10-

102(h).

An early case involved a dispute as to whether the lessee of a mining claim could rightfully deduct the lessor's share of the gross product tax from his royalty interest. *Miller v. Buck Creek Oil Co.,* 269 P. 43 (Wyo. 1928). The court did not reach the question of whether the gross product tax was "a tax upon the mining claim [mineral estate], or upon the oil produced therefrom," but held, nevertheless, "[i]t would seem no more than just that, in the absence of contract, the tax ought ultimately to be borne by the parties in proportion to their respective interests in the production that is the basis of the tax." *Id.* at 44-45.

In *Board of Commissioners of Sweetwater Co., Wyo. v. Bernardin,* we took up the issue *Miller* did not reach, whether the gross products tax was a tax against the minerals extracted and thus a tax on personal property or whether it was a tax against the mineral estate (merely measured by gross production during the previous year) and thus a tax on real property.[14] 74 F.2d 809 (10th Cir. 1934),

---

[14]In *Bernardin,* the Central Coal & Coke Company incurred, inter alia, gross product taxes due Sweetwater County, Wyoming, for coal produced in 1929 and 1930 (assessed in 1930 and 1931 respectively). In early 1931 a receiver was appointed for the company. The receiver continued coal production in 1931, as to which a gross product tax was assessed in 1932. Sweetwater County argued the gross product tax assessed in all three years was a tax on the mineral estate and, as a consequence, the liens for its collection were, under Wyoming law, superior to the lien of a first mortgage deed given in 1922 (supplemented in 1924). The trustees of the mortgage deeds and the receiver resisted this argument and contended the gross product tax was a tax on personal property and a lien to enforce it was junior to the lien of the first mortgage deed. 74 F.2d at 811-12.

-11-

*aff'g First Nat'l Bank of Chicago v. Central Coal & Coke Co.,* 3 F.Supp. 433 (D.

Wyo. 1933). Interpreting Article 15, Section 3 of the Wyoming Constitution,

together with the then-existing statutory scheme (analogous to the present one),

we found:

> The gross product is the thing which must be returned for assessment
> and taxation, and not the land. The phrase 'in lieu of taxes imposed
> upon the land,' indicates that the tax is to be imposed upon the
> product instead of the land, and that the latter is to be exempted
> during such time as it is being worked or operated for the production
> of minerals.

*Id.* at 813. "Section 3 and the statute enacted to carry it out, indicate that mineral

is exempt from taxation until produced, and that a tax in lieu of a tax on the land

is then to be levied on the severed product." *Id.* "We conclude that the gross

product tax is a tax on personal property."[15] *Id.* at 814.

---

[15]We find the court's treatment of the gross product tax assessed in 1931 (on 1930 production) in *Bernardin* noteworthy. Even though the tax was assessed *after* the receiver was appointed, the court declined to treat it in the same way it treated the gross product tax assessed in 1932 (on 1931 production). Because the 1931 assessment related to production that occurred before the receiver was appointed, it was not, like the 1932 assessment, treated as an expense of administration senior to the first mortgage deed. *See First Nat'l Bank of Chicago v. Central Coal & Coke Co.,* 3 F.Supp. 433, 438 (D. Wyo. 1933) ("The receiver therefore as an operator and producer became amenable in 1932 to an assessment return and a production tax upon the output from the mines for the year 1931, and should be required as any operator to comply with the statute."), *aff'd sub nom., Bd. of Comm'rs v. Bernardin,* 74 F.2d 809 (10th Cir. 1934). Instead, the 1931 assessment was placed in the same category with the 1930 assessment (on 1929 production): the lien for it was junior to the lien of the first mortgage deed. *Bernardin,* 74 F.2d at 814. The lesson we take from this distinction is that the entity that owns the production is liable for payment of the gross product tax, irrespective of when the tax is assessed.

In *Belco Petroleum Corp. v. State Board of Equalization, Wyo.,* the court distinguished the severance tax[16] from the ad valorem tax on gross products. 587 P.2d 204 (Wyo. 1978). It characterized the latter as one "levied upon the preceding year's production" which was "called upon to bear the burden of the tax[,]" *id.* at 210, "where the gross product of oil production was taxed on its value on the basis of the current mill levy." *Id.* n.7. Notwithstanding levy in the following year, the tax is "payable upon production . . . ." *Union Pacific Res. Co. v. State,* 839 P.2d 356, 372 n.7 (Wyo. 1992). "Ownership [of the produced mineral] is the important question for ad valorem tax liability purposes." *Wyo. State Tax Comm'n v. BHP Petroleum Co. Inc.,* 856 P.2d 428, 434 (Wyo. 1993).

Notwithstanding these authorities, Abraxas insists the gross product tax authorized by Article 15, Section 3 of the Wyoming Constitution is a tax on the unproduced mineral estate in 2000 (measured by gross production the preceding year)[17] and from this premise argues the 2000 assessment is payable by the owner

---

[16]Unlike the ad valorem tax on gross production, the severance tax is "an excise tax laid upon the present and continuing [p]rivilege of extracting minerals. The value of the privilege is measured by applying a certain percentage figure to the gross production of the previous year." *Belco Petroleum Corp.,* 587 P.2d at 210. *See also* WYO. CONST. art. 15, § 19 (authorizing severance tax) and WYO. STAT. ANN. §§ 39-14-201-211 (implementing severance tax for oil and gas production). The procedure for quantifying and valuing production, for purposes of both the severance and ad valorem tax, is identical. *See id.* §§ 39-14-202-203, 207.

[17]*See* n.7.

of the mineral estate in 2000.[18]  Apart from its dissonance with statute, regulation

and case law,[19] this argument does not square with the root constitutional

_____

[18]Abraxas contends our decision is controlled by a case in which we construed the Colorado scheme for taxing producing oil and gas interests. *Fed. Land Bank of Wichita v. Bd. of County Comm'rs of the County of Adams,* 788 F.2d 1440 (10th Cir. 1986).  The Land Bank argued produced minerals were personal property and subject to taxation as such.  Based on the Colorado constitution ("[T]he valuation for assessment for producing mines, as defined by law, and lands or leaseholds producing oil or gas, as defined by law, shall be a portion of the actual annual or actual average annual production therefrom, based upon the value of the unprocessed material, according to procedures prescribed by law for different types of minerals." COLO. CONST. art. 10, § 3(1)(b)) and statute ("Real property means: . . . (b) All mines, quarries, and minerals in and under the land, and all rights and privileges thereunto appertaining[.]" COLO. REV. STAT. ANN. § 39-1-102(14)(b) (quotation omitted)), we concluded Colorado law classified unproduced mineral interests as realty, taxed them as such, and  measured their value by the value of earlier production.  "Past production is used in the Colorado ad valorem tax system only as a gauge for the valuation of the mineral interests.  Use of this admittedly imperfect gauge does not rule out the conclusion that the mineral interest itself is being taxed." *Fed. Land Bank of Wichita,* 788 F.2d at 1442.  The Colorado scheme to tax the mineral estate (calculating its value against production) is altogether different from the Wyoming scheme which taxes production itself "in lieu of taxes on the lands . . . ." WYO. CONST. art. 15, § 3.  Thus, Abraxas' citation to *Federal Land Bank* is inapposite to our discussion.

[19] Abraxas' argument is identical to the one we rejected in *Bernardin*:

> The receiver and trustees contend that the gross product taxes assessed against the Central Company during 1930 and 1931, are taxes on the coal produced which is personal property, and hence are a lien on the real estate of the Central Company subject and inferior to the lien of the mortgages. *The claimants insist that the gross product tax is a tax on mines and mining claims, measured by the value of the gross product thereof during the previous year,* and a first lien thereon.
>
> * * *
>
> It is therefore necessary to determine whether the gross product tax is a tax on the minerals after they have been severed, or a tax on the realty measured by the gross mineral product thereof.

74 F.2d at 812 (emphasis added).

-14-

provision which plainly characterizes the gross product tax as being "in lieu of taxes on the lands . . . ." WYO. CONST. art. 15, § 3. If the framers had intended to say the value of gross product was merely a gauge of the value of the unproduced mineral estate and had intended to tax the mineral estate itself, as Colorado does,[20] they could have explicitly so provided. They did not. *See* JOURNAL AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF WYOMING (The Daily Sun, Book and Job Printing, 1893) at 636-697.

We therefore hold that liability for the gross product tax attaches when the mineral is extracted and, absent agreement to the contrary, lies with the owner of the extracted mineral, notwithstanding the fact that the mechanics of valuation, assessment, levy and collection occur in the year following extraction. Apart from statutory construction and legal precedent, common sense and intuitive logic suggest this result. Abraxas, not Samson, made the strategic management decision to produce its minerals, and it profited from the production. Surely the obligation to pay a tax on production should lie with the party who conjures it into being and enjoys its benefits. We next turn to whether the parties by their Agreement adjusted Abraxas' responsibility under the law to pay the gross product tax assessed in 2000.

---

[20]*See* n.18.

***Purchase and Sale Agreement***

Put simply, Abraxas argues Article 10.2 of the Agreement controls responsibility to pay the gross product tax assessed in 2000, while Samson contends Article 10.3 controls. Abraxas concedes Article 10.3 of the Agreement addresses production taxes (taxes measured by hydrocarbon production) in general. *See* Wyo. Dep't of Revenue Rules & Regulations, Ch. 6 § 4(n) (defining "production taxes" as including not only the gross product tax but also the severance tax,[21] the Oil and Gas Conservation Tax, the black lung excise tax and the abandoned mine lands fee). However, Abraxas points out that Article 10.2 requires Samson to pay all ad valorem taxes for 2000. Since the gross product tax is also an ad valorem tax, which is not disputed, it argues Article 10.2 is a subset of 10.3, insofar as ad valorem taxes on production might be concerned, requiring Samson to pay these taxes.

Samson maintains the gross product tax is a "tax[] measured by Hydrocarbon production" (R. Appellant App. Vol. I at 59) governed strictly by Article 10.3 and is therefore Abraxas' responsibility to pay. In the alternative, Samson argues even if Article 10.2 controls responsibility to pay the gross product tax, it specifically imposes that responsibility on Abraxas "for periods before [January 1, 2000]" (*id.*) and a tax on 1999 production is a tax for a period

---

[21]*See* n.16.

before January 1, 2000. Neither party contends the Agreement is ambiguous, and the district court did not find it so. Neither do we. Thus, like the district court, we construe the intent of the parties from within the four corners of the document. *Amoco Prod. Co.,* 2 P.3d at 540.

While it is true, as Abraxas urges in attempting to fix our gaze on Article 10.2, that Article 10.3 is easily construed to apply to production taxes other than the gross product tax, thereby explaining its presence in the Agreement, we observe it is also true that Article 10.2 is easily construed to apply to ad valorem taxes other than the gross product tax. After all, real property, improvements thereon and personal property (in addition to gross product) are all taxed ad valorem. *See* WYO. STAT. ANN. § 39-11-103(a)(i) ("All property within Wyoming is subject to taxation . . . ."). Properties of this kind were conveyed by the Agreement in addition to the oil and gas producing properties, and Samson freely acknowledges its obligation under Article 10.2 to pay 2000 ad valorem taxes on such properties. *See* n.1. In its view, it is its tax-paying responsibility as to these other properties that Article 10.2 addresses.

While the contract is not a model of clarity with respect to fixing responsibility to pay the ad valorem gross product tax assessed in 2000, and while either Article 10.2 or 10.3 might be construed to impose responsibility to pay it, we identify no evidence in the record to convince us the parties intended in their

-17-

private arrangement to shift the responsibilities otherwise imposed by law for payment of the tax. Nor do we regard the two provisions in dispute as necessarily in conflict with each other.

Although inartfully headed "Severance Taxes," which the gross product tax decidedly is not, Article 10.3 goes on to require Abraxas to pay "all severance or other taxes measured by Hydrocarbon production . . . to the extent attributable to production . . . before [January 1, 2000]." (*Id.*) This provision accurately describes the gross product tax due for 1999 production. At the same time, Article 10.2 places on Abraxas the responsibility to pay ad valorem taxes "for periods before [January 1, 2000]" and on Samson the responsibility to pay the taxes "for periods on and after [January 1, 2000]." (*Id.*) Abraxas contends the "period" of a tax is the period when it is assessed. Samson argues "period" refers to when the tax liability arises. We incline toward the latter view, if for no other reason than it comports with common sense and the expectations of the parties. *See also* Wyo. Dep't of Revenue Rules & Regulations, Ch. 6 § 5(a) (liability for gross product tax arises on extraction). As we noted earlier, it is counter-intuitive to suppose one party, acting alone, would make a strategic management decision to extract minerals from a property and profit therefrom only to leave the tax-paying responsibility for the extraction to another party apparently uninvolved in the extraction decision. Absent explicit language to the contrary, not present

-18-

here, we are loath to construe the Agreement in this way. To do so would simply abjure "[c]ommon sense and good faith . . . ." *Polo Ranch Co.,* 969 P.2d at 136. We therefore conclude Articles 10.2 and 10.3 are consonant with each other and Abraxas bears the burden to pay the ad valorem tax on gross production in 1999 (assessed in 2000).

## CONCLUSION

We AFFIRM the judgment of the district court.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge